the latter refused his consent, and the witness Helen Robinson, who was in training for nursing at the time, testifies that the plaintiff was in the operating room several times soon after his coming to the hospital, and that after one of these visits to the operating room Dr. Collins told him in her presence that he couldn't reduce the dislocation without opening the knee, and that the plaintiff—

"didn't seem to want to have it done. He said he would just let it go as it was, he didn't want to have it done; he was a little afraid of cutting."

Several other witnesses testify in reference to the operations of Dr. Collins, though they.are not able to fix the exact dates, and it is difficult to understand how the jury could have reached the conclusion that the defendant neglected any duty which he owed to the plaintiff.

It does not, in view of the prejudicial error occurring at the opening of the trial, appear to be necessary to determine the question of the weight of evidence, or what is the effect to be given to a second verdict of the jury. The trial now under review did not preserve to the defendant his rights; his case was prejudiced by the interjection of matter having no relation to the issues, and which plaintiff's counsel must have known was highly improper, and the defendant ought not to be adjudged to pay this plaintiff $4,000, unless he has, by due process of law, established his superior right to the same, and this he has failed to do.

The judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the final result.

LYON, J., concurs. SMITH, P. J., and KELLOGG, J., concur upon the ground that the verdict is against the weight of evidence. HOWARD, J., dissents.

---

(161 App. Div. 304)

NEW YORK STATE NAT. BANK OF ALBANY v. WHITEHALL WATER POWER CO., Limited.

(Supreme Court, Appellate Division, Third Department. March 13, 1914.)

1. CONTRACTS (§ 213*)—CONSTRUCTION CONTRACT—TIME OF COMPLETION.
   Where when a contract was made for constructing an addition to a mill it was understood that the wheel pit was also to be lowered the depth specified in the contract, the time it would take competent engineers, with knowledge of the actual physical conditions and with adequate equipment, to do such additional work should be added to the contract time for completing the work.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 957–977; Dec. Dig. § 213.*]

2. CONTRACTS (§ 300*)—CONSTRUCTION CONTRACT—TIME OF COMPLETION.
   Where a supplemental construction contract provides for the doing of additional work which lies at the foundation of the work originally contracted for, the law implies that the time stipulated in the original contract for completing the work is thereby extended by the time necessary for doing the extra work.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1372–1381; Dec. Dig. § 300.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. CONTRACTS (§ 322*)—CONSTRUCTION CONTRACTS—ACTION—SUFFICIENCY OF
   EVIDENCE.
   In an action involving liquidated damages for failure to construct an
   addition to a mill within the time contracted for, evidence *held* not to
   show that the first cofferdam was constructed upon the theory that the
   wheel pit was not to be changed, but to show that the wheel was to be at
   a greater depth.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1306, 1307, 1339,
   1347, 1348, 1465, 1492, 1534–1542, 1754, 1768, 1772, 1801, 1802, 1804–1808,
   1815, 1816; Dec. Dig. § 322.*]

4. CONTRACTS (§ 213*)—CONSTRUCTION CONTRACTS—TIME OF COMPLETION—EX-
   TRA WORK.
   Where the parties to a construction contract contemplated that the time
   required for the deepening of the wheel pit should be added to the time
   provided for completing the contract, the time required for deepening the
   wheel pit must be determined in view of the physical conditions of the
   ground as they actually were, and not as they were believed to be.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 957–977; Dec.
   Dig. § 213.*]

5. CONTRACTS (§ 285*)—CONSTRUCTION CONTRACTS—DECISION OF ARCHITECT.
   Where a construction contract expressly provided that, should there be
   any discrepancy between the specifications and plans, the architect's ex-
   planation thereof should be final and binding upon the contractor, a deci-
   sion of the architect that certain work was not extra work, but was re-
   quired by the contract under the plans and specifications, was binding.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1290, 1291, 1303,
   1304; Dec. Dig. § 285.*]

Appeal from Special Term, Washington County.

Action by the New York State National Bank of Albany against the
Whitehall Water Power Company, Limited. From a judgment for
plaintiff, defendant appeals. Affirmed as modified.

See, also, 140 App. Div. 739, 125 N. Y. Supp. 861.

Argued before SMITH, P. J., and KELLOGG, LYON, HOW-
ARD, and WOODWARD, JJ.

Edgar T. Brackett, of Saratoga Springs, for appellant.

Hun & Parker, of Albany (Marcus T. Hun, of Albany, of counsel),
for respondent.

JOHN M. KELLOGG, J. The plaintiff's assignor constructed an
addition to the defendant's mill, and there is unpaid on the contract
price $11,678.96, for which, and for certain alleged extra work, the
plaintiff seeks recovery. By the contract, dated May 3, 1905, the
work was to be completed September 1, 1905, within 3 months and 28
days. It was in fact completed July 1, 1906, 13 months and 28 days
after the date of the contract, and 10 months after the agreed time.
The contract provided $50 per day as liquidated damages to the de-
fendant for each day's delay in the completion of the work, and that
the delays should be apportioned. The defendant, by its counterclaim,
seeks to recover such liquidated damages for 303 days. The judg-
ment appealed from determines that the deepening of the wheel pit
3½ feet, which was provided for by a supplemental agreement, ex-
tended the contract so that the time did not begin to run until Jan-

uary 1, 1906, thus driving the work into cold weather, which made great delay in laying the brick and placing the floor beams, and such work, which should have been completed in one month in seasonable weather, required three months, thus extending the contract time two months more, with the result that 47 days of the delay were chargeable to the contractor, the balance to the defendant.

[1] This case was before us in 140 App. Div. 740, 125 N. Y. Supp. 861, and it is unnecessary to repeat the facts there stated. When the contract was made it was understood that the wheel pit, which lay at the very foundation of the work, was to be lowered one foot or more below the depth specified in the contract, for which the contractor was to receive $2.50 per cubic foot, and that the contractor was to be notified of the depth required as soon as a determination was made. We held that until the contractor was so notified the original contract practically remained in suspense, and that the time intervening was not a part of the contract time. This was not upon the theory that the owner or the architect had delayed the work, but that the parties had, in substance, agreed that the work need not be entered upon until the nature of this foundation work was agreed upon. We also held that if this extra work necessarily required extra time for its completion, with reference to the work itself or the extra cofferdam made necessary for it, such extra time was to be added to the contract time. This did not mean that the time which the contractor might spend upon the work, or in experimenting upon the cofferdam, was to be added to the contract time, but that the situation as it actually existed was to be considered, and if engineers competent for such work, who had full knowledge of the condition of the bed of the lake and the other conditions, with adequate machinery and appliances, proper supervision and working to capacity, would be engaged a certain time in the necessary performance of such work, that such time should be added to the contract time.

[2] The law implies that where, by a supplemental agreement, additional work, which lies at the very foundation of the contract work, is agreed upon, the term of the original contract is extended by the time which is necessary for the performance of such extra work. It is evident that the wheel pit could not be lowered 3½ feet without taking some time. It is also apparent that in agreeing to deliver the building in 3 months and 28 days the contractor had undertaken to do a great deal of work in a very short time. It must have been within the understanding that the deepening of the wheel pit would necessarily cause some extension of the contract time. The parties not having agreed upon the extended time, it follows that the extension was for such time as the extra work at the place where it is to be performed reasonably requires under favorable conditions.

The important questions for consideration are when the contractor was notified that the wheel pit was to be lowered 3½ feet, and how much time was added to the contract on that account. It was assumed upon the former appeal that such notice was given July 7th when the blueprints for the work were furnished. Upon a careful consideration of the present record it is clear that the contractor had due notice on

June 8th, and should then have entered upon the work. According to the plaintiff's theory the contractor had substantially built the cofferdam in which the wheel pit mentioned in the original contract was to be placed, that such work was done in reliance upon the original contract, and without expectation that the wheel pit was to be deepened, and that the change of plan made necessary a new cofferdam. It is evident that the contractor cannot have an extension of the contract upon the theory that it remained in suspense awaiting the determination as to the deepened wheel pit, and at the same time be credited with the construction of the first cofferdam which he claims was built upon the theory that there was to be no deepening of the wheel pit.

[3] The facts do not justify the claim that the first cofferdam was constructed upon the theory that there was to be no change in the wheel pit. Upon May 24th, 21 days after the date of the contract, the architect wrote the contractor that nothing was being done with reference to the cofferdam, and he urged him to begin work upon it, saying, "as the change which is contemplated in this work will not affect the size of cofferdam required and the extent to which it will be carried." The contractor replied upon the 25th of May that he would take immediate steps in progressing the work. He began the work June 1st. He gave the order for the iron June 1st; June 3d some of the order was canceled "to the extent of the wheel pit and the top of the turbine pit iron. Daggett [the contractor's superintendent] informed us that there would be a change in that iron." The work upon the cofferdam was done by the carpenters and masons and the ordinary workmen employed upon the job. No man familiar with such work laid it out or determined as to its condition or supervised it. After it was built the contractor was unable to free it from water. In the contract it was specified that the contractor should satisfy himself as to the nature and location of the work bid for, "of the quality of the materials required and of all other matters which can any way influence their contract, and no misunderstanding on these matters will in any way relieve the contractor from any risks or from filling the terms of the contract." On June 6th the contractor wrote the architect that he had not received information "as to the depth of the wheel pit or the arrangement of the wheels in the wheel pit chamber so it is impossible to order the beams." The architect replied the next day that he would be at Whitehall Thursday morning, and if the contractor and the superintendent would be there, the matter of the wheel pit would be settled; that the style of wheel to be used had delayed the determination, but that matter would be settled Thursday. The evidence shows that on June 8th, at Whitehall, the depth of the wheel pit was determined and the contractor's superintendent duly notified. Closson, the engineer of the firm which was to furnish the iron, swears that upon the 9th Gilroy, the architect's representative, came to Albany "and told us to order the beam for the wheel pit according to certain sizes and dimensions which we worked out. * * * They were ordered under his instructions June 12th." There is no substantial denial of the fact that on June 8th the contractor was notified that the wheel pit was to be deepened 3½ feet. We quote from the respondent's brief:

"The plans for the revised wheel pit were not received by McKinney & Sons from Gilroy until June 9, 1905."

July 3d the architect wrote the contractor, complaining that the cofferdam had not been pumped out and no brick or stone work started, and continues:

"It seems impossible for you to finish your contract in time at the rate at which you are going and I wish to impress upon you the necessity of putting more men or taking other steps to expedite the work, as I do not wish to be compelled to take action as outlined in article 5 of the contract, but will be compelled to do so if work does not proceed faster."

To which the contractor replied July 6th, the day before he received the blueprints, that there were unexpected difficulties in getting the water out of the cofferdam, which are liable to occur, and that he expects a diver at the earliest possible date, and that the water in the lake has been two or three feet higher than usual. There was no suggestion that the defendant did not know the depth of the wheel pit. On June 20th the contractor wrote the architect that when he and Daggett met at Whitehall June 8th, it was arranged that Gilroy was to go to Albany and assist the contractors there in arranging the steel for the revised wheel pit, and stated that Daggett reported that the owner would bear the extra cost of the iron caused by purchasing it from stock, and asked him to confirm that statement to the iron men. The architect replied June 21st, referring to the change in the wheel pit:

"Two weeks have now elapsed since you were notified of the final decision in the matter."

On July 11th the architect writes the contractor that the work on the cofferdam is not progressing satisfactorily, and that he doubts their ability to finish the contract on time; that he is desirous of avoiding trouble in the settlement, and hopes they will put on all the help possible and push the work to completion, and offers any assistance which may be asked of him. On August 14th a similar letter is written, urging that he hurry up work upon the cofferdam, and on August 23d he writes, inclosing a letter from the owners which complains that the men working upon the cofferdam have shown themselves thoroughly incapable regarding submarine work, and declares that the matter cannot be continued, and the architect writes that more men must be put on, more men with skill in the line of cofferdam work, or they will be compelled to take the action outlined by article 5 of the contract. Article 5 permits the owner to discharge the contractor and finish the work on his account. The contractor replied August 23d that he would like to confer with the architect in Philadelphia or Whitehall. The contractor went to Philadelphia. Apparently there was no complaint of the criticisms made as to the conduct of the work on the cofferdam. No claim was made after June 8th that the work was being held back for want of notice that the wheel pit was to be lowered.

We have seen that the contractor was to take all the chances as to the conditions at the place where the work was to be performed. In fact he made no adequate examination of the place where the cofferdam was to be, either at the time the contract was made or at the time when the first cofferdam was constructed. Neither the contractor nor

the defendant or architect in fact had any real knowledge of the actual conditions existing under the water at the place where the cofferdam was to be built. And if they had known, none of them had sufficient experience to enable him to appreciate the difficulties. The contractor began the cofferdam with the knowledge that the wheel pit was to be lowered, but he assumed, as did the architect, that the lowering of the wheel pit would not make any difference in the size of the cofferdam or its exact location. This evidently would have been a correct supposition if the lake bottom had been a rock surface, such as they evidently supposed it to be. As matter of fact it was a rock surface, with a gradual slope into the lake, and in a short distance the rock disappeared and broken stone only was found, which furnished no satisfactory anchorage for a cofferdam, with the result that the water came through the bottom and the cofferdam could not be made dry. The contractor, up to July 7th, in a way was trying to perfect the first cofferdam and prevent its leaking. Up to that time the building of the cofferdam had been in inexperienced hands, and the principal trouble came from the fact that the condition of the bottom of the lake at this point was not definitely known, and that the parties building the cofferdam did not have the experience or ability to construct a proper cofferdam on such a bottom. The diver was not an engineer, but had had practical experience in diving, and some experience in building cofferdams, although he evidently did not appreciate the situation, or know how to meet it, and the work of completing the first, second, and third cofferdams was evidently experimentally conducted at great disadvantage, delayed at times by the absence of the diver or the want of proper machinery. The diver, in showing his qualifications, says:

"I am a diver; have been engaged in that work 12 years; I have searched for bodies, raised boats, built intakes for waterworks, and have built several cofferdams."

The lake at this point did not have a treacherous or shifting bottom. From the fact that a part of the cofferdam would rest upon a sloping rock and the balance upon a sloping bed of loose stone, it presented unusual difficulties, evidently beyond the ability of the diver to cope with. The witnesses of the plaintiff are quite indefinite as to the actual work done from time to time upon the cofferdam. The diver worked 57 days. Gilroy, a representative of the architect, kept a diary, showing what men were engaged upon the entire work from day to day and where employed. His evidence indicates that during many working days no work was done upon the cofferdam, and indicates quite clearly that the work was not progressing with the intelligence, force, and attention which the circumstances required.

It is evident that the first cofferdam was built with the understanding that there was to be a greater depth to the wheel pit than contemplated in the original contract, for after the actual depth was known the work upon it continued to July 10th. Here is a month and two days lost time clearly chargeable to the contractor. At the trial those in the employ of the contractor seemed to understand that the first cofferdam was entirely useless in making the deeper wheel pit, and unfitted and unsuited for the deeper wheel pit. This knowledge had been

gained long after it was arranged to lower the pit. Undoubtedly such work was caused by the lowering of the wheel pit, and great difficulties were found in building the cofferdam. It is nevertheless clear that if the contractor had obtained full knowledge of the condition of the lake at this point, and had put the work in the hands of a competent engineer, with competent assistants, much less time would have been expended upon it. A great part of the delay is attributable solely to the inexperience of those who were conducting the work, and from unsuccessful experiments which would have been unnecessary if the condition of the lake bottom had been thoroughly known, and if the parties doing the work had been capable of understanding what those conditions meant. The cofferdam was not a part of the work under the supervision of the architect; it was a structure which the contractor was to build in his own way, to furnish him a place in which to do the contract work. The mistakes of the contractor are in no way chargeable to the architect. No delay was suffered in obtaining the ironwork for the cofferdam. It was upon the ground September 3d, long before the contractor had any occasion to use it. The time from May 3d, the date of the contract, to June 8th, being 1 month and 5 days, during which the contractor was not informed of the proposed depth of the wheel pit, should be added to the term of the contract, making the time when the work was to be finished October 6th. It is somewhat difficult to determine just how much time was wasted in useless experiment, or in not giving proper attention to this work. When the new cofferdam was begun about July 10th, it took some time to remove the old one and the gravel which had been placed around it. This time was not chargeable to the defendant, as the entire work with reference to the first cofferdam was a mistake.

[4] We must assume it was the intention of the parties that by the agreement for the deepening of the wheel pit there was added to the contract all the time which that work necessarily required. Such time is not to be based upon what the parties then understood was the condition of the river bottom, as they all were in error with reference to it, and none of them, if they had actually known the condition, would have comprehended the difficulties presented. But the situation must be taken just as it was, and not as it seemed to be. The parties did not understand the actual situation, and had no accurate appreciation of what would be a reasonable time for the work as the situation actually was. It is therefore for the court to determine what was a reasonable time for doing the work at the place where the contract required it to be done, and we are not controlled by the mistake under which the parties were acting at the time. Competent men, familiar with such work under water, who actually comprehended the exact situation and had the proper machinery and appliances, undoubtedly could have done this extra work in three months. A considerable part of the time used up must be considered as chargeable to inexperience and ignorance of the actual condition of the lake and of what those conditions meant, and to the want of a proper working force and competent supervision. We, therefore, add three months to the term ending Oc-

tober 5th, with the result that the contract should have been fully performed on or before January 5th. .

Before the cofferdam was finished much of the brickwork had been done. It is found that the remaining brickwork and the laying of the beams could have been done in a month of favorable weather. If the wheel pit had been finished October 5th, there was ample time for doing this work before the winter closed in. There is therefore no extension on account of the winter weather. The contractor is responsible for the delays from January 5th to July 1st, 1906, 151 days, exclusive of Sundays, and the defendant is entitled to receive $50 per day, the liquidated damages therefor.

In the letter of July 6, 1905, in furnishing the revised plans for the wheel pit, the architect stated that there would be a saving of $480.90 in the structural steel and cast iron, and in other items, making a total of $751.10, a rebate which will be due the owner. And it is urged by the defendant that the trial court erred in not allowing that sum. On August 5th the defendant's superintendent acknowledged the receipt of the letter, and stated they had not received the statements from the iron men, and could not check the matter up, but that it would have attention. The amount was certified by the architect in his final certificate. The court has found that the architect's certificate was unfair and not binding upon the contractor. All the parties interested were apprehensive that the delay in determining the depth of the wheel pit might cause a delay in getting the iron therefor, and thus delay the job. Daggett claims that the architect directed that the iron and steel be obtained at the earliest moment, and if bought from stock, the extra costs would apply on the saving in weight. There seems to have been reason for the suggestion. The evidence shows that, while there was a saving in the weight of the iron, there was no saving in the cost, for in order to get a prompt delivery it was necessary to buy from the stock of dealers in New York and not from the manufacturers. The court has evidently accepted Daggett's view of the situation, and was fairly warranted in so doing. The certificate was unfair with reference to the steel and iron, and not within the terms of the contract. No allowance should be made by the contractor on account of the steel and iron. The remainder of this credit certified by the architect has not been met, and it is not shown that there was error in this certificate as to the other items certified. The contractor was therefore chargeable with $270.20 on account of the saving in material, and the judgment should be modified by allowing the defendant that amount.

[5] At an early date it was discovered that, according to the specifications, the roof of the addition did not meet the roof of the main building, and it was necessary to make a slight elevation in the new roof to conform to the old at the place where they join, for which the court has allowed the plaintiff $200 as extra work. The drawings indicated that the roofs joined. The construction of the plans under the contract was left with the architect. It was provided in the specifications that:

"Should there appear any discrepancy between them and the plans the architect shall explain them and such explanation shall be final and binding upon the contractor, who will make no charge or claim for extra work in con-

sequence of such explanation, and he shall execute the work in accordance therewith."

It was also provided that no extras shall be allowed without a written order from the architect, and that if any other work than shown is required, the architect must fix the price of it, and the contractor shall abide by it. These conditions were binding, and were not waived. This work was not directed as extra work. The architect claimed it was required by the original contract, and his decision as to the meaning of the plans and specifications is binding. The judgment should be modified by striking therefrom this allowance.

The court reverses the finding that the defendant is only entitled to $2,350 as liquidated damages, and that there was due, and the architect should have certified to, $11,678.96 to the plaintiff; that the plaintiff performed extra work with reference to the roof of the value of $200; that the plaintiff is entitled to recover $10,899.61, with interest; the ninth finding of fact; the tenth finding of fact; the eleventh finding of fact; the thirteenth finding of fact except the first two sentences thereof. And, in lieu thereof, the court finds that the plaintiff had notice as to the depth of the wheel pit June 8, and should have then commenced work thereon; that by delay in giving notice as to the change in the wheel pit the contract time was extended 1 month and 5 days; that building of the cofferdam was in the hands of inexperienced, incompetent men, with an inadequate force, who did not know the situation at the place where the cofferdam was to be built, and that a great part of the delay in building the cofferdam and the wheel pit arose from those facts; that by the contract the plaintiff was chargeable with knowledge of the situation at the place where cofferdam was to be built, and competent men, with proper appliances and a sufficient force, should have constructed it in three months' time, or by September 8th; the deepening of the wheel pit extended the time for the completion of the contract until January 5, 1906, and for all delays after that the plaintiff is responsible, and should be charged with $50 per day liquidated damage for each working day; the change in the wheel pit made a saving to the plaintiff in material, other than steel and iron, of $270.20, which should be allowed to the defendant. The computations may be made pursuant to these findings and the opinion, and incorporated in the order.

The judgment should therefore be modified as stated in this opinion, and, as modified, affirmed, with costs to the appellant. All concur.