Janowitz Brothers Venture, Respondent, v 25-30 120th Street Queens Corp., Appellant.

Second Department, June 9, 1980

**APPEARANCES OF COUNSEL**

*Ralph F. Clements, Jr. (Harry Baron* of counsel), for appellant.

*Berman & Freedman (Donald E. Freedman* of counsel), for respondent.

### OPINION OF THE COURT

DAMIANI, J. P.

In this case, the defendant, 25-30 120th Street Queens Corp., was the owner of a certain tract of land which it had purchased from the City of New York in 1966 and which was located under the waters of Flushing Bay. The land was the size of an entire city block between partially paved upland 120th Street to the east and the bed of the mapped but unopened 119th Street which lay underwater to the west. When originally purchased by defendant the land was unusable because it lay below the legal grade level. Before building could begin, fill had to be supplied to the site in order to bring it up to the established grade.

On May 7, 1968 the defendant corporation entered into a contract to sell the property to a joint venture of three brothers named David, Saul and Samuel (now deceased) Janowitz. In order to understand the issues presented, a close examination of the contract of sale is required. The price was $152,000 payable (1) $5,000 down upon signing the contract, (2) by taking subject to a first mortgage held by the City of New York, (3) by granting a second mortgage in the sum of $12,000 to one Joseph Schneiderman and paying him the sum of $20,000 partly in cash, and (4) by granting a purchase-money, third mortgage for the balance in favor of the seller.

A rider to the contract of sale recited that Joseph Schneiderman had a prior "contract equity" in the property and set forth the understanding of the parties to the effect that Schneiderman's contract interest would be terminated by paying him $20,000 in cash and delivering the $12,000 second mortgage referred to above. An additional rider to the contract contained the following relevant provisions:

"3A) The parties hereto recognize that the Seller is obligated to bring the land which is the subject of this contract to approved building grade, supplying all necessary fill and doing any necessary additional work, all as necessary to comply with the requirements of the City of New York Department of Marine and Aviation and any other Department or agency having jurisdiction thereover. At the time of closing title the Purchaser will execute a purchase-money third mortgage in the amount hereinabove set forth and same will be held in escrow by the attorney for the Purchaser upon the specific

understanding and agreement that it will be delivered to the Seller only after compliance with the obligation of the Seller to complete the filling and grading of the property and the obtaining of letters approving the completed condition from the necessary City Departments. If same is not delivered within a period of six (6) months, the Purchaser shall have the right to proceed with the supplying of fill and grading of the land and will, in such event, be entitled to a credit against the purchase-money mortgage in an amount equal to 133⅓% of the cost to the Purchaser for completing such work. Such computation shall include the cost of fill or other materials, the cost of supervision and overhead. Upon completion of the work and computation of the offset as herein set forth, the Purchaser shall be entitled to receive from the Seller a certificate of reduction of the principal amount of the purchase-money mortgage, and upon receipt of same the mortgage will be delivered to the Seller.

"4A) It is further understood and agreed by the parties that the amount of the purchase-money mortgage will be reduced further by an amount equal to the total cost of interest on the first, second and third mortgages, interest on any monies expended by the Purchaser in connection with the clearing of title or satisfying of liens or encumbrances, real property taxes, all computed for the period up to the date when the escrowee will be obligated to deliver the purchase-money mortgage to the Seller as herein required, it being intended that all adjustments shall, in effect, have been made as of that date, which date, for purposes herein, is referred to as the 'adjustment date'.

"5A) Any provision of this contract necessary to give effect to the intent of the parties shall be included in the mortgage and shall survive delivery of title.

"6A) The purchase-money mortgage, as well as the mortgage to be given to Joseph Schneiderman hereinbefore referred to, will each contain an exculpatory clause limiting the liability of the Purchaser to the land only and providing that the Mortgagee will in no event look to the Mortgagor for payment of any deficiency judgment. Said mortgages will also contain provision for release clauses based upon the sum of 125% of the mortgage burden borne by the land to be released and will provide further that in no event will any default be declared except after twenty (20) days' written notices to the Mortgagor with opportunity to cure the alleged default.

"7A) The obligation of the Seller to establish the land at grade shall specifically include the requirement that the Seller provide all necessary fill and do all necessary grading in connection with the streets abutting the subject premises."

The closing took place on June 14, 1968. At that time the parties orally changed the material terms of the transaction. Instead of terminating Schneiderman's "contract equity" in the property by paying him $20,000 and granting him a $12,000 mortgage as called for in the contract of sale, the parties agreed to pay Schneiderman the sum of $25,000 in full satisfaction of his claims on the property. No second mortgage was ever executed in favor of Schneiderman and the purchase-money mortgage called for in the contract then became the second rather than the third mortgage encumbrance upon the property. After this arrangement was reached, Schneiderman signed a document which, in effect, released all his claims against the property.

The transaction was completed by the execution of a purchase-money mortgage in the amount of $32,958.68 with interest to run at 6% per annum from the date of closing, payable quarterly thereafter. The mortgage further provided that it was subordinate to a first mortgage in favor of the City of New York, that the mortgagee agreed to look solely to the land for payment of the mortgage debt and that in the event of a default the Janowitz Brothers Venture would not be liable for any deficiency judgment.* Finally, the mortgage contained a rider with the following two paragraphs:

"22. The parties agree that the Mortgagee is obligated to bring the aforesaid premises to approved building grade, supply all necessary fill and do any necessary additional work, all as necessary to comply with the requirements of the City of New York Department of Marine and Aviation and any other department or agency having jurisdiction thereover. The Mortgagee agrees to complete the filling and grading of the property and obtain letters approving the completed condition from the necessary City departments. If same is not delivered within a period of six (6) months from date, the Mortgagor shall have the right to proceed with the supplying of fill and grading of the land and will, in such event, be entitled to a credit against the purchase-money mortgage in an amount

---

* The parties have informed the court that in accordance with this provision no bond or note was ever executed in connection with the mortgage.

equal to 133⅓% of the cost to the Mortgagor for completing such work. Such computation shall include the cost of fill or other materials, the cost of supervision and overhead. Upon completion of the work and offset as herein set forth, the Mortgagor shall be entitled to receive from the Seller a certificate of the reduction of the principal amount of this mortgage.

"23. The Mortgagor shall have a credit against the amount of the mortgage for the following items:

"A) Interest paid or accrued on the first mortgage held by the City of New York from April 1, 1968 to the date of delivery of the letters and/or certificates referred to in the preceding paragraph:

"B) Taxes paid or accrued from July 1, 1968 to the same date;

"C) Interest at six (6%) percent per annum on the amount of $12,000.00 from June 14, 1968 to the same date.

"All of the provisions of this paragraph and the preceding paragraph shall be complied with prior to the delivery of the mortgage to the attorney for the Mortgagee for purposes of recording same."

Pursuant to a separate agreement dated June 14, 1968 the mortgage was not delivered to the seller for recording but instead was held in escrow by the attorney for the purchaser upon the following terms: "It is specifically understood and agreed that this mortgage will be delivered to you or your lawyer after compliance with your obligation to complete the filling and grading of the property covered by the mortgage being conveyed to Janowitz Bros. Venture this day and obtaining all letters approving the completed condition from the necessary city departments."

Shortly after the seller had purchased the property from the City of New York in 1966 and had obtained a landfill permit, it entered into an agreement with a landfill contractor named John Ursini to bring the land up to grade at no charge to the seller. Essentially, Ursini agreed to fill the property to grade in exchange for the privilege of using the site as a place for others to dispose of their unwanted fill. Ursini was paid by these third parties for disposing of every load of fill. After the closing Ursini continued to deposit fill upon the property to carry out the seller's duty to complete the filling operations. At the trial Ursini and the president of the seller corporation

both testified that the filling was completed within six months of the closing in full compliance with the original permit, but that at the request of the buyers, additional fill was supplied to the site to straighten its western boundary and to extend the toe of the fill into the midline of the underwater mapped 119th Street. They claimed that this extension of the fill was outside the boundaries of the original permit granted by the city, was therefore not required by the contract of sale or mortgage, and was done at the sole request of the buyer. According to Ursini the delay in completion of the work was occasioned by the necessity of obtaining an amended landfill permit and performing the additional work requested by Sam and Saul Janowitz.

Ralph Clements, the president of the seller, testified that he personally inspected the property in December, 1968 and observed that it had been completely filled to the perimeters of the permit, which had been staked out. Beginning in April, 1969, he demanded delivery of the mortgage from the buyer and its attorney but they did not comply and had not delivered the mortgage at the time of trial despite the fact that the City of New York issued a certificate of completion on September 12, 1972.

David Janowitz testified for the buyer that the filling operations extended from June, 1968 until September, 1972. He denied that he or his brothers requested Ursini to deposit extra fill on the property, claiming that such extra filling would have been of no advantage to the buyer. In September, 1970 he and his brother Saul visited the property where they met Ursini, Clements and an inspector from the city. At that time the inspector disapproved of certain railroad ties, rubbish and garbage which had been dumped onto the property, and told them to stop filling operations until this organic fill was removed. Thereafter only "clean" fill could be supplied to the site. According to David Janowitz the buyer did not exercise its right to complete the filling operations itself because it would have cost more than $100,000 to fill the property if the seller did not do so and Ursini and Clements insisted that they could complete the job less expensively.

As a result of the dispute between the parties concerning (1) the date upon which filling operations were completed in accordance with the contract and (2) the amount of credits to be awarded against the amount of the mortgage, the buyers commenced this action for a determination of the amount due

and for the discharge of the mortgage upon the payment of such sum and delivery of a satisfaction piece by the seller.

Trial Term found that under the specific terms of the mortgage the buyer was entitled to have the landfill completed to the satisfaction of the City of New York and that the evidence demonstrated that the city inspectors were not satisfied until September 12, 1972, the date of the completion certificate.

On appeal the defendant seller contends that Trial Term erroneously relied upon the fact that the completion certificate was not issued until September 12, 1972 since the weight of the evidence showed that the filling operations were actually completed within six months, as required by the terms of the mortgage, and that the delay in obtaining the completion certification from the city was caused by the extension of the area of the fill beyond the boundaries of the property pursuant to the request of the buyer. Essentially, the seller is here relying upon a rule of law long recognized by the courts of this State. Where performance of a contract obligation is delayed by the request of the obligee that the obligor perform additional work, the obligee will not be permitted to assert to its advantage the failure of the obligor to perform within the time originally called for by the contract (*Kenny v Monahan,* 53 App Div 421, 424, affd 169 NY 591; *Smith v Gugerty,* 4 Barb 614, 621; *Klein v Young,* 168 NYS 526; see 5 Williston, Contracts [3d ed], § 677), and performance of the original and additional work will be required within a reasonable time thereafter (*New York State Nat. Bank, Albany v Whitehall Water Power Co.,* 161 App Div 304, 311-312).

The decision of Trial Term implicitly resolved the disputed factual question of whether the Janowitz brothers did indeed request additional work in favor of the plaintiff and against the defendant. Resolution of this factual dispute turned upon the credibility of the witnesses at the trial and, in such case, the determination of the trier of the facts, who saw and heard the witnesses, will be accorded the greatest weight and will not ordinarily be overturned upon appeal (*Barnet v Cannizzaro,* 3 AD2d 745, 747; *Amend v Hurley,* 293 NY 587, 594). Trial Term's implicit finding that no request for additional work was made and that the four-year delay in obtaining a certificate of completion was attributable to the defendant seller is in accord with the evidence and is therefore affirmed.

Some seven months after Trial Term rendered its decision and five months after the entry of judgment, the defendant moved to vacate the judgment and to obtain a new trial upon the ground of newly discovered evidence. This evidence was a copy of a letter from the Department of Marine and Aviation of the City of New York to the city Department of Highways dated June 14, 1968 (the same date as the closing) which stated in part that "[p]lacement of the fill has exceeded the area approved under the work permit plan and the placement of fill actually extends into beds of the adjacent mapped streets." The letter went on to inquire whether the Department of Highways had any objections, comments or requirements in connection with an amended plan submitted by defendant which called for extension of the fill into the bed of the mapped streets.

■ The court's denial of the defendant's motion for a new trial should be affirmed. First, the letter could have been discovered by the exercise of reasonable diligence in time for trial (see CPLR 5015, subd [a], par 2; *Cizler v Cizler,* 19 AD2d 819; *Mully v Drayn,* 51 AD2d 660). Second, it is improbable that the letter would have produced a different result (see CPLR 5015, subd [a], par 2; *Matter of Deutsch v Deutsch,* 59 AD2d 741). It indicates that the amended plan to cure the unauthorized encroachment of the fill in the bed of the mapped streets was not submitted at the request of the Janowitz brothers made after the closing, but was made by defendant itself before that time. Further, it fails to establish that although the "area" of the fill exceeded the original permit lines, the "height" of the fill was sufficient to bring the property up to grade.

■ We conclude, therefore, that the defendant's duty under the mortgage to complete the filling operations and obtain a certificate to that effect was completed on September 12, 1972 when the certificate was issued. The terms of paragraph 23 of the mortgage allow credits against the principal sum "to the date of delivery of the letters and/or certificates" of completion. The certificate of completion was mailed to the plaintiff buyer on September 27, 1972 and, accordingly, that date should have been used as the "adjustment date" upon which the credits ceased.

■ We turn now to the computation of the credits. Defendant contends that plaintiff is not entitled to more than six months of credits because paragraph 22 of the mortgage

provided that if the certificate of completion was not delivered within that time "the Mortgagor shall have the right to proceed with the supplying of fill and grading of the land and will, in such event, be entitled to a credit against the purchase-money mortgage in an amount equal to 133⅓% of the cost to the Mortgagor for completing such work." Defendant appears to claim that this language imposed a duty upon the buyer to complete the work if the seller did not do so within six months. This contention is without merit. By its express terms the mortgage creates a "right" to complete the filling. It does not impose a duty to do so. The words right and duty are correlative terms referring to a jural relationship existing between two persons and contract language which creates a right in one person cannot at the same time impose a duty upon such person to exercise that right (see Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L J 16, 28-32; Corbin, Legal Analysis and Terminology, 29 Yale L J 163, 164-167).

Defendant also contends in this regard that since the mortgage granted plaintiff the right to complete the work itself, it was bound to do so in order to mitigate defendant's damages. It is often said that a party injured by a breach of contract has a duty to mitigate or minimize the damages liable to result from such breach (*Den Norske Ameriekalinje Actiesselskabet v Sun Print. & Pub. Assn.*, 226 NY 1, 7). Williston opined that actually the rule merely prohibits an injured party from recovering for such items of loss following breach as he might have avoided by reasonable effort without undue risk or expense (11 Williston, Contracts [3d ed], § 1353; Simpson, Contracts [2d ed], § 199; cf. *Colonna v State of New York*, 232 App Div 385, 386; 13 NY Jur, Damages, § 23, p 453; § 27, p 457).

The mortgage sets no specific time within which the seller was required to perform its duty to fill and obtain the completion certificate. However, the mortgage does give the buyer the right to fill the property itself if the seller had not completed the job within six months. We may therefore conclude that the seller was obliged to perform within a reasonable time, i.e., in approximately six months. There is no evidence of any intention upon the part of the buyer to treat the seller's failure to complete the filling operations within six months as a breach of the mortgage contract. Rather, it appears that the buyer was content with the slow but free

work performed by Ursini. Assuming however that the seller's failure to timely complete the project was a breach of contract, the buyer could not then recover its damages arising from the delay (the credits against the mortgage) to the extent that those damages could have been avoided had it exercised its right to complete the job itself, *provided that by doing so the buyer would not have been exposed to unreasonable risk or expense.*

The testimony established that after six months the cost of hiring another contractor to complete the work would have exceeded $100,000. The mortgage provides only for a credit against the principal amount thereof of 133⅓% of the buyer's cost of completion. Since the mortgage was only for some $32,000 a deduction of $133,333 (133⅓% of $100,000) would have left the buyer with an unrecoverable loss of approximately $101,000. This was manifestly unreasonable and the Justice at Trial Term so found. Accordingly, the buyer had no duty to mitigate the damage in the form of increased credits against the mortgage that the seller would suffer because of its protracted delay in completing the filling.

The defendant seller next contends that Trial Term erred in failing to reform the mortgage so as to delete the credit against the amount of the mortgage provided in subdivision C of paragraph 23 thereof as follows: "Interest at six (6%) percent per annum on the amount of $12,000.00 from June 14, 1968". In order to understand the purpose of this and the other credit provisions of the mortgage it is important to remember that the property was unusable until filled up to the legally established grade level. The manifest intent of paragraph 4A of the additional rider to the contract of sale and of paragraph 23 of the mortgage was to exempt the buyer from certain specific costs of holding title to the property at a time when it was unusable because the seller had not completed the filling work. One of these costs within the original contemplation of the parties was the interest on the $12,000 second mortgage which was to be given to Schneiderman in return for the extinguishment of his contract equity in the property. At the closing, Schneiderman's interest was purchased for cash, and the contemplated $12,000 mortgage was not given to him. Ralph Clements testified at the trial that the credit provided in subdivision C of paragraph 23 of the mortgage for 6% interest on $12,000 had reference to the proposed but unconsummated mortgage transaction with Schneiderman

and that the parties had inadvertently failed to delete it when the terms of the over-all transaction were changed at the closing. The position of the buyer was that the express wording of subdivision C makes no reference to a mortgage, either to Schneiderman or any other person, and that by its terms it merely calls for a mathematically ascertainable credit in a sum equal to 6% interest on a certain amount of money. Trial Term adopted the buyer's interpretation by awarding the credit called for in subdivision C of paragraph 23.

The issue on appeal then is whether the seller is entitled to reformation of the mortgage contract upon the ground of mutual mistake. It is the general rule that where a written instrument fails to conform to the agreement between the parties in consequence of the mutual mistake of the parties however induced, or of the mistake of one party and fraud of the other, a court will reform the instrument so as to make it conform to the actual agreement between the parties *(Albany City Sav. Inst. v Burdick,* 87 NY 40, 47). The mutual mistake must be material, that is, it must involve what Williston calls a "fundamental assumption" of the contract (13 Williston, Contracts [3d ed], § 1544). However, it does not mean such mistake as would have caused the parties not to contract had they known of it. Rather, a material mistake is one which vitally affects a fact or facts on the basis of which the parties contracted (13 Williston, Contracts [3d ed], § 1544, p 96). In this case the contract of sale clearly called for a credit against the mortgage in the amount of the interest paid by the buyers on the $12,000 second mortgage to be given to Schneiderman. The evidence establishes and we find that subdivision C of paragraph 23 of the mortgage was drawn prior to the closing in conformity with this provision of the contract of sale. When the agreement concerning the purchase of Schneiderman's interest in the property was changed at the closing, the parties failed to simultaneously change the wording of the mortgage by deleting subdivision C of paragraph 23. We find that this failure to conform the purchase-money mortgage to the new agreement was the result of mutual mistake and that it was material since it related to what was essentially a price term of the contract. The purchase-money mortgage was to cover the unpaid balance of the purchase price. The purpose of the credits against the purchase-money mortgage was to indemnify the buyer for the costs incurred in holding title to the property for the period when it was unusable. Hence a

credit against the principal sum of the purchase-money mortgage in practical effect works an alteration of the price. The price term is certainly a material element of a contract for the sale of real property (62 NY Jur, Vendor and Purchaser, § 9).

It has been said that proof of mistake must be "of the highest order", that it must "show clearly and beyond doubt that there has been a mistake" and that it must show with equal clarity and certainty "the *exact* and *precise* form and import that the instrument ought to be made to assume, in order that it may express and effectuate what was really intended by the parties" (13 Williston, Contracts [3d ed], § 1548, p 125; *Moyer v Title Guar. Co.,* 227 Md 499, 504-505). This test has been fully met since it is clear from the contract of sale that the interest credit on $12,000 had reference solely to the proposed second mortgage to Schneiderman and the purchase-money mortgage document can be reformed to reflect the actual transaction of the parties simply by deleting subdivision C of paragraph 23 thereof. Finally, in this regard it might be argued that the failure to correct the mistake was due to the seller's own negligence since if its president had read the purchase-money mortgage carefully he would have discovered that it did not conform to the new agreement of the parties. However, it is the rule that the failure of a party to read a deed or mortgage does not bar reformation even where the mistake does not affect the description of the property but rather some other aspect of the transaction (see Ann. 81 ALR2d 7, § 13, p 54; *Albany City Sav. Inst. v Burdick,* 87 NY 40, *supra).*

The final issue on appeal concerns the calculation of the amount of interest due upon the purchase-money mortgage. At various times the parties advanced three conflicting theories of how interest should be computed. In its complaint the buyer calculated interest by deducting the credits set forth in paragraph 23 from the principal sum of the mortgage and calculating interest on the balance from the date of completion, i.e., September 12, 1972. In the fourth affirmative defense and counterclaim set forth in the seller's answer it is contended that interest was due upon the principal sum of the mortgage from the date of closing. At the trial the attorney for the buyer advanced yet a *third* method of computing interest, viz., that the proper amount of interest could be arrived at by deducting the credits from the principal sum of

the mortgage and then computing interest upon the balance from the date of closing. Trial Term adopted the method of calculation advanced in the buyer's complaint, namely awarding interest upon the balance due from the date of completion.

A proper evaluation of these conflicting theories again requires examination of the relevant provisions of the contract of sale and purchase-money mortgage. As stated above, the original agreement was that the purchase-money mortgage would become the third mortgage upon the property, subordinate to the first mortgage of the City of New York and the proposed $12,000 mortgage of Schneiderman. Paragraph 2A of the additional rider to the contract of sale called for the purchase-money mortgage to bear interest at 6% per annum, payable semiannually and to run "for a period of seven (7) years from 'adjustment date' as hereinafter fixed". Paragraph 4A of the additional rider to the contract of sale provided, *inter alia,* that the amount of the purchase-money mortgage would be reduced by "an amount equal to the total cost of interest on the first, second and *third* mortgages" up to the date upon which the escrowee would be required to deliver the mortgage, which date would comprise the "adjustment date". These provisions were somewhat contradictory. Paragraph 2A of the additional rider provided that the purchase-money mortgage was to run for seven years from the adjustment date and this appears to be in harmony with the fact that the mortgage was to be held in escrow until that date and that the debt evidenced by the mortgage was not the personal responsibility of the buyer but was secured solely by the lien it created upon the land conveyed. However, paragraph 4A of the additional rider calls for a credit in the amount of interest upon that same mortgage from closing to the adjustment date.

In any event, the terms of the mortgage are different from those of the contract of sale. The mortgage states that it runs from June 14, 1968 for seven years until June 13, 1975 and not, as called for by the contract, for seven years from the adjustment date. In addition, paragraph 23 of the rider to the mortgage fails to contain a credit for interest due on the mortgage from the date of closing to the adjustment date as required by the contract of sale.

No evidence was adduced at the trial to explain the inconsistencies between the contract of sale and the mortgage. Under the former, interest was either not due or was deducted from the adjusted price by a credit until the certificate of

completion was delivered to the escrowee. Under the latter, the obligation to pay interest commenced at the closing and was not reduced by a credit for interest actually paid. In the absence of evidence upon this issue we are unable to conclude, as we did concerning the credit provision relating to the proposed $12,000 Schneiderman mortgage, that the variances between the terms of the contract of sale and the purchase-money mortgage were the result of mutual mistake. Accordingly, the matter must be remitted to Trial Term for a new trial on this issue. In the absence of any proof of an explicit agreement to change the terms of the contract of sale, the mortgage should be reformed to conform thereto.

Therefore, the order should be affirmed, the judgment modified by deleting the first decretal paragraph thereof, and the action remitted for a new trial in accordance herewith.

TITONE, COHALAN and O'CONNOR, JJ., concur.

Order of the Supreme Court, Queens County, dated September 9, 1977, affirmed, without costs or disbursements.

Judgment of the same court, dated February 10, 1977, modified, on the law, by deleting the first decretal paragraph thereof. As so modified, judgment affirmed, without costs or disbursements, and action remitted to Trial Term for further proceedings in accordance with the opinion herein.