**In re David SCHICK, Venture Mortgage Corp., and A & D Trading Group, L.L.C., Debtors.**

**Bankruptcy Nos. 96 B 42902(SMB), 96 B 43969(SMB), 96 B 46282(SMB).**

United States Bankruptcy Court, S.D. New York.

April 26, 1999.

592

Parker, Chapin, Flattau & Klimpl, LLP, New York City, for the Chapter 11 Trustee, Lee W. Stremba, of counsel.

Law Offices of Moshe Katlowitz, New York City, Employee Retirement Trust and Rochel Properties, Inc., for Claimants Arnav Industries, Inc., Moshe Katlowitz, of counsel.

## MEMORANDUM DECISION REGARDING OBJECTION TO CLAIMS AND CROSS–MOTION FOR RELIEF FROM THE AUTOMATIC STAY

STUART M. BERNSTEIN,
Bankruptcy Judge.

The chapter 11 trustee objects to the claims of Arnav Industries, Inc. Employee Retirement Trust ("Arnav") in the amount of $4,828,275.03, and Rochel Properties, Inc. ("Rochel") in the sum of $11,823,-044.62 (Arnav and Rochel are referred to collectively as the "Claimants"). The trustee relies on a prepetition judgment and related stipulation, described below, that limit the aggregate claims of Arnav and Rochel to approximately $2 million.

In response, the Claimants assert that the stipulation was induced by fraud and rife with mistake. They seek relief from the automatic stay to proceed in state court to vacate the judgment, and rescind or reform the stipulation. For the reasons that follow, the Claimants are barred as a matter of law from seeking rescission based on fraud. An evidentiary hearing is necessary to decide if they can vacate the judgment and reform the stipulation based on mistake, and whether the trustee is entitled to sanctions. However, the hearings will be conducted in this Court as part of the claims objection process, and accordingly, the Claimants' cross-motion for relief from the automatic stay is denied.

### BACKGROUND

This dispute arises out of a venture involving the purchase and renovation of an

apartment building in Philadelphia by Mayfair Renaissance Associates, L.P. ("Mayfair"). The debtor, David Schick, was a limited partner in Mayfair and a shareholder in its corporate general partner. Mayfair borrowed money from the Claimants, and issued promissory notes that Schick as well as several others personally endorsed. (*See Application of Arnav Industries [Etc.]*, dated Nov. 16, 1998 ("*Cross–Motion*"), Ex. "A".) Schick apparently also executed separate guaranties of Mayfair's obligations, though these have not been proffered by either party.

The Mayfair project failed, and two state court lawsuits followed. In one action (the "Rochel Action"), Rochel sued Schick and the other obligors on the notes (collectively, the "Obligors"). In the course of the Rochel Action, Schick and his wife Chani confessed judgment, jointly and severally, in the amount of $400,000.00. (*Affirmation of Lee W. Stremba in Further Support, [Etc.]*, dated Dec. 14, 1998 ("*Stremba Aff. in Further Support*"), Ex. "D".) The affidavit of confession recites that the judgment would not limit or prejudice the plaintiff's rights to pursue the individual Obligors under the notes and guaranties. (*Id.*, ¶ 9.)

The second action was commenced by two of the Obligors, Abraham and Sharon Borenstein, against, *inter alia*, the Claimants and Schick. In early 1996, the Claimants, represented by the law firm of Brown, Raysman & Millstein ("Brown, Raysman"), entered into two successive stipulations of settlement with their co-defendant Schick. (*See Supplemental Application of Arnav Industries, [Etc.]*, dated Dec. 8, 1998 ("*Claimants' Supp. Applic.*"), Ex. "D" (Memorandum from Schick to James Landau, Esq. of Brown, Raysman).) These stipulations lie at the core of the present dispute.

Brown, Raysman initially prepared a stipulation of settlement, dated January 29, 1996 ("First Stipulation"). (*Cross–Motion*, Ex. "C".) The First Stipulation recited that Schick was in default under the

notes and guaranties, acknowledged the judgment by confession entered in the Rochel Action, and stated the parties' "desire to resolve all claims between and among them." It provided a schedule of payments totaling $2,080,000.00, commencing with an initial payment of $580,000.00 due by February 9, 1996, and ending with the final payment due by the end of 2002. (*Id.*, ¶ 1.) Though not explained in the First Stipulation, the parties selected $2,080,000.00 because they had agreed to a $2,500,000.00 settlement amount, but Schick had previously paid the Claimants $420,000.00.

In exchange for the promised payments, the Claimants agreed to take all necessary steps to satisfy the judgment by confession against David and Chani Schick. (*Id.*, ¶ 2.) In addition, and contemporaneously with the execution of the stipulation, the parties were obligated to execute mutual releases of all claims between them, except for any fraudulent transfer claims or claims to enforce the stipulation. (*Id.*, ¶ 6.) The releases were fully enforceable upon execution of the stipulation. (*Id.*) Brown, Raysman would hold the stipulation in escrow, and upon Schick's failure to cure a default within five days' notice thereof, release the stipulation to the Claimants in order to enter a judgment in favor of Rochel in the amount of $4,353,-038.98 plus interest, and in favor of Arnav in the amount of $1,770,663.97 plus interest. (*Id.*, ¶ 13.)

Within a few days, Brown, Raysman notified Schick and Joseph Wassner ("Wassner"), a trustee of Arnav and vice president of Rochel, that it would be necessary to execute a second stipulation to correct an error in the First Stipulation. (*Compare Cross–Motion*, Ex. "B" (*Transcript of Schick Deposition*, held Nov. 10, 1998 ("*Schick Dep.*")) at 19–20 *with Affirmation of Joseph Wassner*, affirmed Nov. 16, 1998 ("*Wassner Aff.*"), ¶¶ 1, 10.) All agree that the First Stipulation contained a typographical error. The schedule of payments correctly totaled $2,080,000.00, but

the introductory text to the schedule referred to "the sum of Two Million Eight Hundred and 0⁰⁄₁₀₀ Dollars ($2,800,000.00)." (*See* First Stipulation, ¶ 1.) Brown, Raysman prepared a new stipulation, dated February 6, 1996 ("Second Stipulation"), which corrected the typographical error and extended the date of the initial $580,-000.00 payment to February 15. (*See Cross–Motion,* Ex. "D".) For reasons that have not been explained, Brown Raysman also changed paragraph 13 to provide that if Schick defaulted, the Claimants could enter judgment in the amount of *$2,080,-000.00,* rather than the approximate $6 million stated in the First Stipulation. Schick, Wassner and the escrow agent signed the Second Stipulation.

Schick failed to make the February 15 payment, and paid only $100,000.00 on February 29, 1996. He made no further payments under the Second Stipulation, and on May 3, 1996, the Claimants, by their attorney James Landau, Esq. of Brown, Raysman, entered a judgment (the "Judgment") in New York county pursuant to the Second Stipulation and New York Civ.Prac.L. & R. ("CPLR") 3215(i).[1] (*See Motion for an Order Expunging Claims, [Etc.],* dated June 3, 1998 ("*Claim Objection* "), Ex. "D".) The Judgment was in the amount of $1,980,000.00 (representing the amount provided in paragraph 13 of the Second Stipulation less the $100,000.00 payment) plus interest, for a total of $2,021,986.85.

Only four weeks later, on May 29, 1996, Schick's creditors commenced an involuntary chapter 11 case. The Court ordered relief, and appointed the plaintiff as trustee on July 8 of that year. On February 27, 1997, the Claimants filed their proofs of claim aggregating over $16 million. The trustee objected by motion dated June 3,

1998, arguing that the claims merged into and were limited by the $2 million Judgment. In response, the Claimants cross-moved for relief from the automatic stay to obtain vacatur of the Judgment in state court and rescission or reformation of the stipulation.

## DISCUSSION

### A. The Preclusive Effect of the Judgment

■ A federal court must give a state court judgment the same preclusive effect as would the state where it is entered. 28 U.S.C. § 1738; *State of New York v. Sokol (In re Sokol),* 113 F.3d 303, 306 (2d Cir. 1997); *Kelleran v. Andrijevic,* 825 F.2d 692, 694 (2d Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988). Under the law of New York, a valid default judgment is *res judicata* as to all claims and counterclaims that could have been brought in the earlier action. *Baker v. Latham Sparrowbush Assocs.,* 72 F.3d 246, 255–56 (2d Cir.1995); *Com Cor Holding, Inc. v. F.A. Tucker Transmission Co.,* No. 93 Civ. 8440, 1998 WL 283348, at *3 (S.D.N.Y. June 1, 1998); *Rizzo v. Ippolito,* 137 A.D.2d 511, 524 N.Y.S.2d 255, 257 (N.Y.App.Div.1988). The same rule applies to a judgment on consent. *See Silverman v. Leucadia, Inc.,* 156 A.D.2d 442, 548 N.Y.S.2d 720, 721 (N.Y.App.Div.1989).

■ The Judgment was entered pursuant to CPLR 3215(i)(1), which governs entry of default judgments for failure to comply with a stipulation of settlement made after commencement of an action. The Second Stipulation immediately released "all claims" between Schick and the Claim-

---

1. CPLR 3215(i)(1) states:

 Where, after commencement of an action, a stipulation of settlement is made, providing, in the event of failure to comply with the stipulation, for entry without further notice of a judgment in a specified amount with interest, if any, from a date

 certain, the clerk shall enter judgment on the stipulation and an affidavit as to the failure to comply with the terms thereof, together with a complaint or a concise statement of the facts on which the claim was based.

ants, with exceptions not relevant here.[2] The Claimants are thus limited, under principles of *res judicata* and by the plain language of the Second Stipulation, to a claim in the principal sum of $1.98 million. In order to circumvent this barrier, the Claimants attack the validity of the Judgment, and ultimately, the underlying stipulations, on theories of fraud and mistake.

## B. Fraudulent Inducement

The Claimants assert that they were fraudulently induced to enter into what they call "the stipulation process," and therefore, seek to vacate the resulting Judgment and rescind both stipulations. They maintain that Schick fraudulently misrepresented "that he had the intent and the assets, thus the ability and willingness, to abide by all of the terms and conditions set forth in the Stipulation." (*Wassner Aff.*, ¶ 8.)[3] According to the Claimants, Schick never intended to perform the stipulated obligations.

### 1. Vacatur of the Judgment

■ Initially, the Claimants have failed to show that they are entitled to vacate the Judgment on grounds of fraud.[4] They entered the Judgment on their own and with-

out Schick's involvement after he defaulted. This is precisely what they bargained for. In any event, even if the Judgment is vacated, or the issue is merged into the question regarding the validity of the stipulations, Claimants have failed to show that they are entitled to rescind the underlying stipulations on grounds of fraud.

### 2. Rescission Based on Fraudulent Inducement

■ Under New York law, a party induced by fraud to enter into a contract has two options. He may rescind, or affirm the contract and sue for damages. *See, e.g., Goldsmith v. National Container Corp.*, 287 N.Y. 438, 40 N.E.2d 242, 244 (1942). In either case, he must prove the same elements: (1) misrepresentation, concealment or nondisclosure of a material fact; (2) intent to deceive; (3) justifiable reliance and (4) a resulting injury. *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (elements of action for rescission based on fraud) (citing *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 835 (1958) (stating elements of action for damages based on fraud)).[5]

---

**2.** Although the Claimants belatedly argue that the Second Stipulation was an executory accord, leaving them the option of pursuing either the full amount of the claims or the judgment provided for in the stipulation, the plain language of the Second Stipulation forecloses the argument. The Second Stipulation releases all claims simultaneously with its execution, and does not provide that the underlying claims are released only upon Schick's full performance under the stipulation. This contrasts sharply with the confession of judgment in the Rochel Action, where the parties, including Rochel, Schick and Moshe Katlowitz, Esq. (the Claimants' present attorney) expressly provided that the underlying claims *would* survive entry of a judgment. (*See Stremba Aff. in Further Support*, Ex. "D".) The Second Stipulation has no such language of survival, and provides but one remedy for Schick's default—entry of a judgment.

**3.** In their *Reply Memorandum of Law [Etc.]*, dated Dec. 29, 1998, the Claimants trot out a slightly different theory. Contrary to Wass-

ner's affirmation testimony that Schick made specific affirmative representations regarding ability and willingness to pay, the Claimants now theorize that Schick "actively concealed and omitted material facts relating to his then current financial situation." (*Id.* at 17.) There may be little difference between affirmatively representing an ability to pay and failing to disclose an inability to pay. Given the disposition of the Claimants' fraud claim, I need not decide this issue.

**4.** The Claimants cite CPLR 5015(a)(3), which contemplates relief from a judgment on grounds of "fraud, misrepresentation, or other misconduct of an adverse party."

**5.** Other authorities include *scienter*, or knowledge of falsity, as an element. *See, e.g., Chase v. Columbia Nat'l Corp.*, 832 F.Supp. 654, 660 (S.D.N.Y.1993) (quoting *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 176 N.Y.S.2d 259, 151 N.E.2d at 836); Restatement (Second) of Contracts, § 162 (1981).

"[R]escission to be effective must be announced without unreasonable delay." *Schenck v. State Line Tel. Co.,* 238 N.Y. 308, 144 N.E. 592, 594 (1924) (Cardozo, J.); *accord, Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d at 47; *United States Postal Serv. v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517–18 (E.D.N.Y.1997). This requirement of promptness is not an affirmative defense; it is "an element of a *prima facie* rescission action and the burden of proof is on plaintiff." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1211 (S.D.N.Y. 1994), *aff'd,* 57 F.3d 146 (2d Cir.1995). Moreover, the party opposing rescission need not have suffered prejudice from the delay. *Id.* at 1211 n. 6. Whether the Claimants acted with reasonable promptness must be determined from all of the surrounding circumstances, *see Schenck v. State Line Tel. Co.,* 144 N.E. at 594, including when the party seeking rescission first knew of the fraud. *See id.* at 593 ("One may confirm a transaction voidable by fraud ... even by silence and inaction with knowledge of one's rights"); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d at 47; *see* Restatement (Second) of Contracts, § 381(2); John M. Friedman, *Delay as a Bar to Rescission,* 26 Cornell L.Q. 426, 432–34 (1941) ("*Friedman*") (period of delay commences when knowledge or notice of the facts is acquired).

Here, the undisputed facts establish that the Claimants failed to seek rescission promptly upon learning of the fraud. They made no effort to disavow the stipulations and Judgment until the instant cross-motion, dated November 16, 1998. In contrast, they acknowledge that they "realized that they had been fraudulently induced into entering into the stipulation process shortly after the [May 29, 1996] involuntary petition was filed against the debtor." (*Memorandum of Law Submitted by [Claimants] in Further Support, [Etc.],* dated Jan. 27, 1999 ("*Claimants' Mem. in Further Support*"), at 6.) This realization was no doubt bolstered by the widespread newspaper accounts of Schick's apparent Ponzi scheme and involuntary bankruptcy filing, (*see id.* at 5 n. 1 & Exs. "B" & "C"), and the rumors that ran rampant among Schick's acquaintances just before the filing. (*See Wassner Aff.,* ¶ 18 n. 1; *Stremba Aff. in Further Support,* Ex. "A" (*Transcript of Wassner Deposition,* held Nov. 30, 1998 ("*Wassner Dep.*")) at 67–68.)

Their lengthy silence is particularly mysterious in light of subsequent events that focused their attention on the stipulations and Judgment. The trustee had commenced an adversary proceeding against the Claimants on or about October 18, 1996, to avoid and recover the $100,000.00 payment made under the Second Stipulation. Following a trial on May 8, 1997, the Court ruled that the entire $100,000.00 was a preferential transfer. (*See Supplemental Affirmation of Lee W. Stremba [Etc.],* dated Jan. 26, 1999 ("*Stremba Supp. Aff.*"), Ex. "D".) Both the Second Stipulation and the Judgment were trial exhibits. (*See id.,* Ex. "A", at 9.) During this entire time, the Claimants never raised any questions about the Second Stipulation, and more important, never took any steps to rescind it or vacate the Judgment.[6]

---

6. On February 27, 1997, the Claimants filed their $16 million claims. They see this as an act disaffirming the fraudulently induced stipulations. To be sure, the $16 million figure is inconsistent with a $1.98 million judgment or a $6 million breach of contract claim. The proofs of claim did not attach the Judgment or stipulations, let alone explain their fraudulent nature or seek rescission. The focus of the promptness inquiry is on reasonable promptness in *seeking to rescind,* not on the span of time between knowledge of the fraud and taking any action inconsistent with the contract. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. at 1211 ("[A] plaintiff is required to assert his right to rescind without undue delay" and "Rescission claims must be instituted promptly after discovery of the fraud.") (citations and internal quotations omitted).

Following the decision in the preference action on July 21, 1997 (approximately one year after the Claimants learned of the fraudulent inducement), the Claimants continued to delay for an additional year. On June 3, 1998, the trustee made the instant motion to expunge the claims. Only then did the Claimants assert their fraud theory to vacate the Judgment and rescind the stipulations. I conclude that this delay of over two years in seeking rescission, despite their knowledge of the grounds therefor, bars the Claimants from seeking rescission as a matter of law.

## C. Mistake

The Claimants also argue that the Second Stipulation and Judgment were induced by mistake. The Second Stipulation, they say, contains a scrivener's error. The parties agreed to a provision authorizing the entry of a $6 million judgment in the First Stipulation, but the Second Stipulation inexplicably reduced the default amount to $2 million. Less than three months later, the Claimants' attorney failed to catch the error when he prepared and entered the default judgment. Ultimately, the Claimants seek to reform the Second Stipulation to correctly reflect the parties' agreement.[7]

7. Although the Claimants speak of rescission for mutual mistake, their argument boils down to an error in reducing an agreement to writing, not a mutual mistake of fact rendering the agreement voidable. Moreover, the relief they seek on this prong of their motion, correction of the stipulation and judgment to the $6 million amount, is consistent with reformation, not rescission. *See* discussion *infra,* § C.2.

8. CPLR 5015(a)(1) allows relief from a judgment or order upon the ground of

excusable default, if such motion is made within one year after service of a copy of the judgment or order with written notice of its entry upon the moving party, or, if the moving party has entered the judgment or order, within one year after such entry. CPLR 5015(a)(1) speaks in terms of "excusable default," but it encompasses the grounds enumerated in Fed.R.Civ.P. 60(b)(1) and for-

## 1. Vacatur of the Judgment

Before they can reform the Second Stipulation, the Claimants must first vacate the Judgment under CPLR 5015(a)(1).[8] Their position on vacatur assumes that the same scrivener's error authorizes the relief. This is not entirely accurate since the entry of the Judgment resulted from a second or additional, unilateral mistake. In other words, while the Claimants maintain that both parties mistakenly overlooked the scrivener's error when they signed the Second Stipulation, the Claimants alone erred when their attorney entered the Judgment based on the $2 million default provision.

The Claimants had additional opportunities to catch the scrivener's error before entering the Judgment. According to the *Affidavit of James K. Landau, Esq., in Aid of Entry of Judgment Pursuant to CPLR 3215(i)(1),* sworn to May 2, 1996,[9] the Claimants sent Schick a Notice of Default prior to entering the Judgment. The parties have not provided a copy, but the Notice of Default may have recited the looming $2 million Judgment. If a copy of the notice was sent to the client, as one would expect, it presumably would have focused Wassner on the error.

mer New York Civil Practice Act § 108: mistake, inadvertence, surprise or excusable neglect. *See* 10 Jack B. Weinstein, *et al., New York Civil Practice: CPLR* (*"Weinstein"*), ¶ 5015.04, at 50–305 (1998); *compare McKenna v. County of Nassau,* 61 N.Y.2d 739, 472 N.Y.S.2d 913, 460 N.E.2d 1348, 1349 (1984) (inherent power of court to relieve party from judgment taken by fraud, mistake, inadvertence, surprise or excusable neglect). The Claimants also rely on CPLR 5019, but it is inapplicable. That section permits correction of clerical errors, as where a judgment fails to accurately reflect the court's decision, and does not apply to mistakes "affecting a substantial right of a party." CPLR 5019(a); *see generally* 10 *Weinstein,* ¶¶ 5019.03–04, at 50–423 to 430.1. Here, the Judgment—which the Claimants' attorneys prepared—accurately reflects the terms of the Second Stipulation.

9. (*See Claim Objection,* Ex. "D".)

In addition, Brown Raysman obviously zeroed in on the $2 million amount when it prepared and entered the Judgment. These same attorneys had also prepared the First Stipulation and the Second Stipulation just three months earlier. They acted as agents for the Claimants when they entered the Judgment, and the Claimants may have difficulty showing excusable neglect. In fact, they may have entered the Judgment with knowledge of the error to accelerate collection activities. Schick's financial problems were becoming well known. Rather than return to Schick and ask him to execute a third stipulation, the Claimants may have preferred to enter a final judgment in a lower amount that they could immediately enforce.

The Claimants have not come forward with evidence to explain the circumstances surrounding the entry of the Judgment. In particular, they have not provided affidavit testimony from Mr. Landau or other Brown Raysman attorneys. I am not deciding this issue now, but emphasize that it is an issue which must be considered separately from any mutual mistake connected with the execution of the Second Stipulation. The parties will have the opportunity to address this at the hearing held in connection with the scrivener's error. The need for that hearing is discussed immediately below.

### 2. Reformation of the Scrivener's Error

■ Reformation and rescission are fundamentally different remedies. Rescission permits a party "to disaffirm the contract and return to the status that existed before the transaction was executed." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. at 1212. Reformation, on the other hand, does not permit disaffirmance. Rather, it concerns an enforceable agreement, incorrectly reduced to a writing, that will be reformed to reflect the parties' true agreement. *Lent v. Cea,* 209 A.D.2d 820, 619 N.Y.S.2d 166, 166 (N.Y.App.Div.1994),

*lv. to appeal denied,* 86 N.Y.2d 703, 631 N.Y.S.2d 607, 655 N.E.2d 704 (1995). There is a strong presumption that a deliberately prepared and executed instrument reflects the intention of the parties. *George Backer Management Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062, 1066 (1978). The party seeking reformation must show by clear and convincing evidence that the parties reached an agreement but through mistake, the instrument does not accurately reflect what they intended. *See Nash v. Kornblum,* 12 N.Y.2d 42, 234 N.Y.S.2d 697, 186 N.E.2d 551, 553 (1962); *Slutzky v. Gallati,* 97 A.D.2d 561, 468 N.Y.S.2d 87, 88–89 (N.Y.App.Div.), *appeal denied,* 61 N.Y.2d 602, 472 N.Y.S.2d 1025, 460 N.E.2d 231 (1983).

■ A scrivener's error will ordinarily provide a basis for reformation, though the fault in drafting lies with only one of the parties. *See Born v. Schrenkeisen,* 110 N.Y. 55, 17 N.E. 339, 341 (1888); *Lent v. Cea,* 619 N.Y.S.2d at 166; *see generally* 16 N.Y.Jur.2d, *Cancellation and Reformation of Instruments* § 66, at 613 (1996). In addition, the negligent failure to read the agreement before signing it does not generally bar relief. *See, e.g., Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co.,* 18 F.Supp. 720, 723 (S.D.N.Y.) ("Questions of negligence play almost no part in suits for reformation"), *aff'd,* 91 F.2d 964 (2d Cir.1937); *Born v. Schrenkeisen,* 17 N.E. at 341 ("such mistake of the scrivener, *or of either party, no matter how it occurred,* may be corrected") (emphasis added); *Janowitz Brothers Venture v. 25–30 120th St. Queens Corp.,* 75 A.D.2d 203, 429 N.Y.S.2d 215, 223 (N.Y.App.Div.1980) (failure to read purchase money mortgage and notice discrepancy with sale agreement); *Schweitzer v. American Cas. Co.,* 33 Misc.2d 217, 226 N.Y.S.2d 267, 271 (N.Y.Sup.1962) (failure to read insurance policy); *Wehner v. Schroeder,* 354 N.W.2d 674, 678–79 (N.D. 1984) (failure to read and compare contract and deed); Restatement (Second) of Con-

tracts, § 157 cmt. b & illus. 3 [10]; *see generally* 16 N.Y.Jur.2d, *Cancellation and Reformation of Instruments* § 81, at 633 (1996).

■ Reformation differs from rescission in another important respect—promptness is not an element of the Claimants' *prima facie* reformation case. *Cf. In re Shaner*, 252 Ill.App.3d 146, 191 Ill.Dec. 839, 624 N.E.2d 1217, 1229 (Ill.App.Ct. 1993) (due diligence in discovering error is not part of plaintiff's *prima facie* case for reformation). The promptness requirement in rescission actions serves two purposes—"the desire that the defending party shall not be damaged by unnecessary delay on the part of the would-be rescinder in asserting his rescission; and ... unwillingness to permit a rescission where the would-be rescinder by his conduct has indicated an intention to abide by the contract." *Friedman*, 26 Cornell L.Q. at 432. A contract subject to reformation, on the other hand, is not voidable and may not be disaffirmed. Restatement (Second) of Contracts, §§ 152(2) & cmt. d illus. 10, 155 cmt. b. Accordingly, the concerns that motivate the promptness requirement are lacking. *cf. United States Postal Serv. v. Phelps Dodge Refining Corp.*, 950 F.Supp. at 517–18 (under New York law, promptness is an element of rescission for fraud, which proceeds on theory of absence of mutual assent; promptness is not an element of rescission for nonperformance, which presupposes mutual assent).

### a. The Claimants' *Prima Facie* Case

■ The Claimants' submissions indicate that reformation may be appropriate,

but factual disputes persist. On the one hand, the First Stipulation implies that the parties agreed to a $6 million default provision. The Second Stipulation reduced that amount to $2 million without explanation. This suggests a scrivener's error. Further, Wassner's affirmation denied any agreement to lower the previously-agreed amount.

On the other hand, the inconsistent writings arguably imply, as the trustee suggests, that the parties agreed to a $2 million judgment, and the First Stipulation was in error. (*See Memorandum of Law in Further Support of Motion to Expunge Claims [Etc.]*, dated Dec. 14, 1998 ("*Trustee's Mem. in Further Support*"), at 13.) Schick's deposition testimony lends support. The Claimants' attorney asked him to state his understanding of the consequences of his default. Without referring to the stipulations, Schick answered that the Claimants could enter judgment in the amount he had agreed to pay, less any amounts he had actually paid. (*See Schick Dep.* at 18.)

### b. The Trustee's Defenses

In addition, the Claimants' reformation claim may be barred by equitable defenses.[11] *See* Restatement (Second) of Contracts, § 155 cmt. d; *see also* 16 N.Y.Jur.2d, *Cancellation and Reformation of Instruments* § 83, at 635–36 (1996) (discussing laches). The trustee contends that the Claimants concealed the existence of the Judgment when they filed their proofs of claim, ignored information requests from the trustee, and only came forward with the Judgment and their mistake argu-

---

**10.** Under the Restatement view, negligence will only bar reformation if the party's fault in failing to know or discover the facts before entering into the contract amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing. Restatement (Second) of Contracts, § 157.

**11.** Ratification does not appear to apply to reformation. Ratification involves the loss of the power to avoid an otherwise voidable

contract by taking acts inconsistent with disaffirmance. *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F.Supp. at 1212; *see Landau v. American Int'l Group, Inc.*, No. 97 Civ. 3465, 1997 WL 590854, at *3 (S.D.N.Y. Sept. 23, 1997); *Reid v. IBM Corp.*, No. 95 Civ. 1755, 1997 WL 357969, at *10 (S.D.N.Y. June 26, 1997); Restatement (Second) of Contracts, § 380. An agreement subject to reformation is not voidable, and cannot be disaffirmed.

ment after the trustee objected to their claims. During this period, memories faded and documents have been lost. (*Trustee's Mem. in Further Support* at 35.)

The record is insufficient to permit conclusions about the precise terms of the parties' agreement, the existence of a scrivener's error or the effect of Claimants' conduct on their right to relief. In addition, a separate question revolves around the mistaken entry of the Judgment. Thus, a hearing is necessary. Through their cross-motion, the Claimants seek relief from the stay to pursue that hearing in state court. For the reasons discussed immediately below, it is preferable to adjudicate the issue in this Court as part of the claims objection process.

### D. Relief From the Automatic Stay

Section 362(d)(1) of the Bankruptcy Code permits a court to modify the stay for "cause," a phrase that is largely undefined in the Code. Although the party opposing stay relief has the ultimate burden of disproving the existence of "cause," *see* 11 U.S.C. § 362(g)(2), the movant has the initial burden to show that it exists. *E.g., In re Mazzeo*, 167 F.3d 139, 142 (2d Cir. 1999); *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir.1990). The burden does not shift if the movant fails to make this showing, in which case the court should refuse to grant stay relief. *In re Mazzeo*, 167 F.3d at 142; *In re Boodrow*, 126 F.3d 43, 48 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1055, 140 L.Ed.2d 118 (1998).

Where a party seeks stay relief to commence or continue litigation in another forum, the bankruptcy court must weigh the request against the following factors in determining if "cause" exists: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or inter-

ference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*In re Sonnax Industries, Inc.*, 907 F.2d at 1286; *accord In re Mazzeo*, 167 F.3d at 142–43. Not all of the factors are relevant in every case, *In re Mazzeo*, 167 F.3d at 143; *see In re Touloumis*, 170 B.R. 825, 828 (Bankr.S.D.N.Y.1994), and the Court need not assign equal weight to each factor. *In re Keene Corp.*, 171 B.R. 180, 183 (Bkrtcy.S.D.N.Y.1994); *In re Touloumis*, 170 B.R. at 828.

The cross-motion poses the question whether the Claimants should litigate their reformation rights in state court or this Court. The motion is akin to one for permissive abstention, and not surprisingly, the considerations that drive an abstention motion coincide with the most relevant *Sonnax* factors, to wit, judicial economy and efficient administration.[12]

Initially, I note that the Judgment was entered as a ministerial act by the state court clerk. The motion to vacate the Judgment—or to bring an independent action in equity to achieve the same result—

12. These factors focus on the interests of judicial economy and the expeditious and economical resolution of the litigation (Factor # 10), and whether the parties are ready for trial (Factor # 11).

will not implicate anything a state court judge said or did. The motion involves a trial and application of state law which either I or a state court judge can accomplish with the same aplomb. I, however, have a head start. I have already examined these issues in depth, and am ready to try the case without the need for further motion papers. In contrast, the Claimants would have to commence an appropriate proceeding in state court, and brief the issues for the benefit of that court. This would involve duplication, require the parties to educate another judge and result in delay.

Further, the state court could not resolve all of the overlapping issues (Factor # 1). The trustee argues, *inter alia*, that the Claimants filed their proofs of claim in bad faith and for an improper purpose. In particular, they ignored the Judgment—and even the First Stipulation—and filed a claim in the amount of $16 million. The claim was unwarranted under any reasonable and nonfrivolous view of the facts and law. Further, evidence may have been lost due to the Claimants' delay in asserting their claim of mistake. The trustee asserts these actions and inactions as an equitable defense to the reformation claim, and as a basis for sanctions or equitable subordination, or both.[13]

The same conduct governs, at least in part, the resolution of these three issues. The state court, however, can only decide the first; I must still resolve other two. This is another species of duplication, but more important, points up that while the state court could afford complete relief on the reformation question, it could not afford complete relief on all of the claims arising from the same conduct. On the other hand, this Court can.

Other *Sonnax* factors also favor denial of the motion. The dispute is connected to the bankruptcy case, and any delay will interfere with the case, (Factor # 2), and prejudice the interests of the other creditors (Factor # 7). The amount in dispute is at least $14 million; the $16 million proof of claim *versus* the $2 million Judgment. To confirm a chapter 11 plan, the trustee would have to reserve against the disputed amount. The case is now nearly three years old, and while the trustee has not filed a plan yet, her ability to confirm any plan and pay creditors may be delayed until the amount of the claim is liquidated. In addition, stay relief is not necessary to place the matter before a specialized tribunal (Factor # 4), and the dispute involves the estate and two of its creditors, not third parties (Factor # 6). In short, the impact of the stay on the Claimants is nil, and the balance of harms weighs decidedly in the trustee's favor. (Factor # 12).

## E. Sanctions

 As discussed, the trustee seeks sanctions, pursuant to 11 U.S.C. § 105(a) or 28 U.S.C. § 1927, arguing that the Claimants have taken actions so meritless they could only have been the result of an improper purpose. The trustee recites a litany of alleged bad faith positions taken by the Claimants, beginning with their filing proofs of claim aggregating $16 million without referring to the extant $2 million Judgment on the same claims, or the stipulations which permitted a $6 million claim at most. (*Trustee's Mem. in Further Support* at 40–43.) Further, the Claimants admit that they reviewed the Judgment and discovered the alleged defects prior to filing their proofs of claim. (*See Memorandum of Law in Support of Cross–Motion [Etc.]*, dated Nov. 16, 1998, at 14.) Since the sanctions request involves many

---

**13.** The trustee has not filed an adversary proceeding requesting equitable subordination. *See* Fed.R.Bankr.P. 7001(8). Nevertheless, the trustee could commence an equitable subordination action, depending on the findings that result from the resolution of her defenses to the reformation claim or her request for sanctions. As a result, the claim may ultimately be subject to equitable subordination, and this militates against stay relief. (Factor # 8).

of the same factual issues as the trustee's equitable defenses, its resolution should abide the trial on the merits of the Claimants' reformation claim.

The parties are directed to contact chambers to schedule a pre-hearing conference. Settle order on notice.