[801 NYS2d 8]

CITY OF NEW YORK et al., Respondents, v STATE OF NEW YORK, Appellant.

First Department, September 1, 2005

**APPEARANCES OF COUNSEL**

*Eliot Spitzer, Attorney General*, Albany (*Victor Paladino* and *Andrea Oser* of counsel), for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Cheryl Payer, Stephen J. McGrath, Alan H. Kleinman* and *Joshua Rubin* of counsel), for respondents.

**OPINION OF THE COURT**

CATTERSON, J.

In 1985, New York City and the New York City Health and Hospitals Corporation (hereinafter referred to as HHC or claimants) commenced an action in Supreme Court, New York County, seeking to compel the New York State Office of Mental Retardation and Developmental Disabilities (hereinafter referred to as OMRDD) under section 13.07 of the Mental Hygiene Law to place, care for or treat numerous developmentally disabled children in foster care referred to it by the Child Welfare Administration (hereinafter referred to as CWA) and developmentally disabled hospital patients referred by HHC.

Under the law, OMRDD "shall assure" the development of comprehensive plans, programs and services with the cooperation of local governments, and provide appropriate facilities and

encourage their provision by local governments. (§ 13.07 [a].) Additionally, OMRDD is responsible for seeing that the developmentally disabled are provided care and treatment.

On May 1, 1991, OMRDD, the City and HHC settled their case, *City of New York v Webb,* by entering into a stipulation (hereinafter referred to as the Webb Stipulation) whereby CWA and HHC would provide a list of priority placements in each of the three fiscal years of 1991-1992, 1992-1993 and 1993-1994 of 250 persons suitable for OMRDD services. The parties' expectation was that OMRDD would place at least 200 individuals from each year's list into its system. The number of placements to be made in the 1994-1995 fiscal year was left for later determination and in February 1994, 200 placements were mutually agreed upon for that year as well.

Inasmuch as 250 names were submitted each year and only 200 placements were required, the City was given discretion to include on a subsequent year's list any of the 50 persons who had not been placed the year before.

In April 1994, claimants brought a contempt proceeding in Supreme Court, New York County, for the State's failure to make the required 200 annual placements. The court denied the contempt based on testimony that noncompliance was unintended and beyond OMRDD's control. The court did however find that OMRDD's failure caused CWA and HHC to incur losses. The court then attempted to fashion its own remedy by treating the stipulation as a contract and awarding the City over $9 million in damages.

On the State's appeal, this Court vacated the award of damages against the State as not within Supreme Court's jurisdiction as only the Court of Claims can award damages for breach of contract by a state agency. (*City of New York v Maul,* 239 AD2d 225 [1997].) Although the City did not cross-appeal from the denial of contempt, and thus did not place the issue before this Court, we nonetheless noted that Supreme Court had "inexplicably declined to find that [the State's] failure to fully comply with a so-ordered stipulation . . . was contemptuous" and that "the record clearly mandates a finding to the contrary." (*Id.*)

The City and HHC then filed a claim against the State alleging that the stipulation is a binding contract on all parties which the State breached by failing to make the required number of placements in a timely fashion. The claimants

sought restitution damages for over $9 million for fiscal years 1992, 1993 and 1994 and additional damages for fiscal year 1995, based on the City's provision of care to mentally retarded children and adults that the State was responsible for under the stipulation.

The State maintained that the Supreme Court had sole jurisdiction over the stipulation, negating the Court of Claims' ability to grant a remedy under it, and that the stipulation is not enforceable as a contract with the State because it had not been approved by the Comptroller as required by statute.

The Court of Claims denied the parties' cross motions for summary judgment.

This Court affirmed, holding that the action was properly before the Court of Claims and that Comptroller approval was not required for this type of restitution claim. (*City of New York v State of New York*, 284 AD2d 255 [2001].)

In this action to recover damages for the City's monetary loss during the fiscal years covered by the Webb Stipulation, the Court of Claims awarded the City the principal amount of $15,257,147 with $8,182,634.88 in interest for a total award of $23,439,781.88.

It is axiomatic that the party "complaining of injury has the burden of proving the extent of the harm suffered." (*Berley Indus. v City of New York*, 45 NY2d 683, 686 [1978]; *accord J. R. Loftus, Inc. v White*, 85 NY2d 874 [1995].) However, while "recovery will not necessarily be denied a plaintiff when it is apparent that the quantum of damage is unavoidably uncertain, beset by complexity or difficult to ascertain." (*Berley Indus. v City of New York*, 45 NY2d at 687.) This rule, born of both necessity and practicality for complex litigation, does not obviate the need for proof based upon matters properly admitted in evidence at trial. The law simply does not permit damages to be based on general assumptions.

The claimants had the burden of proving damages at trial with a reasonable certainty. (*Manshul Constr. Corp. v Dormitory Auth. of State of N.Y.*, 79 AD2d 383, 387 [1981].) To accomplish this task the City relied on the computations of Judy Shernicoff, who conducted budget oversight for the City's Child Welfare Administration during the period covered by the Webb Stipulation and, based on her testimony, claimed damages of approximately $18 million.

Shernicoff estimated the costs of the unplaced referrals based upon the average cost of housing groups of that size. For the first three years under the stipulation, a representative sample of 56 individuals who had been referred early, but who had not been placed as of April 1, 1994, was used to determine the CWA's annual cost of care. Shernicoff calculated the City's average cost per individual for four categories: those under 21 and placed with a CWA voluntary contract agency, those over 21 similarly placed, those under 21 and placed at an outside specialized facility, and those over 21 similarly placed. A weighted annual rate for each fiscal year for each category was computed and multiplied by the cumulative shortfall in placements by the State to arrive at an estimate of what it cost the City each year to care for the individuals that should have been cared for by the State under the stipulation.

As for the individuals still not placed at the end of the 1995 fiscal year, each was eventually placed by the State by October 1995. Shernicoff used the average number of days those individuals in each category remained in the City's care between April and October of 1995, multiplied it by the weighted annual cost of caring for someone in their category based on a "representative" sample of persons placed between April 1, 1994 and October 1995, divided by 365, and then multiplied by the number of individuals in each category that were not placed as of March 31, 1995. Shernicoff labeled the four resulting numbers as the gross cost of caring for the average individual in each category during the April October 1995 time span. These numbers were then multiplied by the percentage of the gross cost the City was responsible for to determine how much it cost the City to support each of the four groups of individuals for the additional seven months.*

---

* While appellant did not raise this point, a careful examination of the record seemingly shows that when the formula mentioned above is applied to the numbers in the chart on the first page of exhibit 14, a significantly different result is reached. Shernicoff lists the costs for CWA/under 21 at $305,990 when the math says $405,663.13, the costs for CWA/over 21 at $827,026 instead of $772,575.50, the costs for NCIB/under 21 at $855,300 instead of $190,709.06, and the costs for NCIB/over 21 at $1,048,934 instead of $515,120.68. This amounts to errors of $99,673.13 in the State's favor, $54,450.50 in the City's favor, $664,591 in the City's favor, and $533,813.32 in the State's favor. In total, Shernicoff apparently made an error of $85,555.05 in the City's favor.

Taking Shernicoff's calculations at face value, the court below found as follows:

|  | Required | Placed | Cumulative Shortfall |
|---|---|---|---|
| FY 91-92 | 200 | 102 | 98 |
| FY 92-93 | 200 | 156 | 142 |
| FY 93-94 | 200 | 173 | 169 |
| FY 94-95 | 200 | 222 | 147 |

In the first fiscal year, the court correctly found that there were no damages, "since the State was permitted, at the latest, to make the placements on the final day of the fiscal year." When the State placed only 102 individuals in the first year, leaving a shortfall of 98 placements, "the City began to incur the cost for those 98 from the first day of the second fiscal year (April 1, 1992)." The court reasoned that, because the State had not made up the shortfall in the second year (1992-1993), "the City had to bear the cost of the 98 for the entire second year." Accordingly, the court concluded that the measure of damages for the second year was "98 times the weighted average net cost, with interest from April 1, 1993."

The court applied the same methodology for the third and fourth years as well. At the end of the second year, the shortfall in placements had increased from 98 to 142 priority placements. From this the court assumed that the City bore the cost of 142 individuals for the entire third year "since the shortfall was not made up during such year." Thus, the court computed damages for the third year based on "142 times the weighted average net cost, with interest from April 1, 1994." At the end of the third year, the cumulative shortfall was 169 priority placements. For the fourth year, although the court adjusted the computations to account for the fact that the State had reduced the shortfall in placements to 147 by making 222 placements, the court applied the same methodology, "namely, that an increase in shortfalls means that for such period, the City is bearing the cost for the prior year's shortfall."

The court awarded damages based on the assumption that the City actually bore the cost of the prior year's shortfall for the entire next year, an assumption that has no evidentiary support in the record.

With respect to new shortfalls arising in the second year, the City incurred no damages until the third year, because the State

had until the end of the second year to place the 200 new referrals made in that year. In the second year, the State placed 156 individuals, 58 more than the prior year's shortfall of 98. If, for example, all 98 of the referrals carried over from the first year were among the 156 placements in the second year, the City's damages would not be 98 times the weighted average cost for the entire second year, but only 98 times the weighted average cost per day, times the average number of days the carryovers remained in the City's care beyond the first year. The same holds true in the third and fourth years, in which the total number of placements was greater than the prior year's carryover shortfall.

While in some cases shortfalls carried over for more than one year, there is no proof of record that, even on average, the carryovers stayed in the City's care for an entire year beyond the year in which they were supposed to have been placed. If we accept that in each subsequent year the City included in its 250 referrals every name that was previously submitted to the State but not actually placed, then it is impossible for all of those individuals to have remained in the City's care for an entire additional year. The inclusion of just the 98 shortfall names from the first year's 250 into the second year's 250 leaves room for only 152 new names in a year when the State placed 156 individuals. To discern exactly how many people the City was caring for that were properly the State's responsibility and for how long the City cared for them, one would need to examine the data on each individual contained on each of the four 250 name lists. Instead, the respondents resorted to a proof by approximation and assumption to arrive at their numbers.

All of this speculation and conjecture, however, could have been avoided had the City presented the actual cost data of caring for the priority referrals, as the State insisted it should have done. Irrespective of the fact that the State began falling short of the stipulation's requirements almost immediately, which should have put the City on alert that litigation might well be necessary, in which case records would be needed to prove damages, this case involves the placement of 800 mentally disabled children and young adults that were dependent on the City's aid. Indeed, it seems beyond contravention that there should be a specific record of each and every one of these individuals, which should, at the very least, provide an accounting of the individual's care and treatment, and the costs attendant thereto.

The City attempted to justify its decision to use weighted costs and averages by observing that "retrieving individual pay-

ment records would have been far more onerous than using a representative sample." While undoubtedly correct as a factual matter, this observation does not render the City's resort to approximation acceptable as a means of establishing damages. Where the City has admitted that "for each child the name, date of birth, date of referral by CWA, location of placement with CWA pending OMRDD placement, the rate of care, and the date of placement with OMRDD" is readily available, it may not resort to an approximation simply because computing an exact number would be difficult. Furthermore, it is axiomatic that the City cannot shift the burden to the defendant by saying that if the State felt an exact calculation would have been more accurate, then the State is at fault for not using the raw data to do the exact calculation.

Equally unavailing is the City's support of Shernicoff's calculations as being "corroborated by two distinct calculations based on the common factual predicates regarding the cost of care to individuals to be placed under the stipulation."

First, the City maintains that a $1,175,256 payment from the State to the City to pay for the cost of care for 43 individuals constituted an admission as to the extent of the City's damages. The City's only support for the alleged admission is an allegation made in the verified claim, which the State denied in its answer. At trial, the City presented no proof that this payment was intended to represent the City's cost of caring for unplaced priority referrals. Even were we to accept that the payment did represent the cost of care of the 43 CWA individuals, such a payment would translate to an average reimbursement of $36,500 a year per person, which is $5,000 to $8,000 less per person than the annual cost of care calculated by Shernicoff in trial exhibit 12.

The other calculation cited by the City, the "program to eliminate the gap" (hereinafter referred to as PEG) estimates, is equally deficient as a measure of the City's damages. Shernicoff herself admitted that the PEG estimates set forth in exhibit C were merely a budgetary projection of savings, and had nothing to do with the calculation of damages. This concession alone warrants the rejection of these budgetary estimates as proof of damages.

Additionally, Shernicoff's concessions as to the nature of exhibits 11, 12, and 14 provide further cause to reject her methodology for ascertaining the City's damages. While not going to the validity of the numbers themselves, Shernicoff admit-

ted at trial that exhibit 11 was prepared for the purpose of litigation, exhibit 12 was based on the numbers in exhibit 11, and exhibit 14 was modified after Shernicoff's deposition, clearly linking its creation to litigation purposes. Since these exhibits were not regularly maintained in the ordinary course of business, but were rather compilations of business records prepared for litigation, their admission in evidence and use for damages calculations should not have been allowed by the trial court.

Furthermore, Shernicoff admitted in testimony that she had no knowledge of the validity of the raw data she used to make her calculations; rather, she stated that she received a list of names and dates from Audrey Elliot, the OMRDD liaison, to which she applied her formulae. The data that serve as the foundation for the damages calculations are not in evidence and their provenance was admittedly unknown to Shernicoff. The actual dollar value of the judgment against the State is entirely predicated upon Shernicoff's calculations and testimony, which in turn is based upon unsupported postulation and estimations, or matters not in evidence, and thereby lacks a proper basis for awarding a large judgment. (*Di Filippo v Gargiulo*, 278 App Div 172, 176 [1951].)

While specific calculations of the cost of care for every individual on Elliot's lists would undoubtedly be a complex and onerous task, supporting the use of more easily understandable summations, that does not absolve the City of its duty to "demonstrat[e] to the extent demonstration is possible" the basis and rationale for those summations. (*Rein v Mottola*, 6 AD2d 57, 61 [1958], republished as mod 6 AD2d 793 [1958].) Without Elliot's lists, Shernicoff's entire testimony as to damages is founded on matters not in evidence and therefore invalid as a basis for the court to award damages against the State.

Because respondents, who bore the burden of proving damages with reasonable certainty, relied on invalid evidence, made unsupported assumptions, and failed to present the underlying data and documents that purportedly serve as a foundation for their entire calculation of damages, the City's claim must be dismissed.

Accordingly, the judgment of the Court of Claims of the State of New York (Alan C. Marin, J.), entered on or about March 19, 2004, after trial, in favor of the City and against the State in the principal amount of $15,257,157, plus interest, should be reversed, on the law, without costs, and the claim dismissed.

ANDRIAS, J.P., SULLIVAN, GONZALEZ and SWEENY, JJ., concur.

Judgment of the Court of Claims of the State of New York, entered on or about March 19, 2004, reversed, on the law, without costs, and the claim dismissed.