## U.W. Marx, Inc. v Dorrough Constr., Inc.

2024 NY Slip Op 30966(U)

March 26, 2024

Supreme Court, Saratoga County

Docket Number: Index No. EF20194437

Judge: Richard A. Kupferman

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SARATOGA

---

U.W. MARX, INC.,

                             Plaintiff,

           -against-

DORROUGH CONSTRUCTION, INC. and
WILLIAM DORROUGH,

                         Defendants.

**DECISION, JUDGMENT, &
ORDER AFTER TRIAL**
Index # EF20194437

---

Appearances:

John P. Mastropietro, Esq.
Mastropietro Law Group PLLC
63 Franklin Street
Saratoga Springs, New York 12866
*Attorneys for Plaintiff*

Frank M. Putorti, Esq.
Frank M. Putorti, Jr., P.C.
1338 Union Street
Schenectady, New York 12308
*Attorneys for Defendants*

KUPFERMAN, J.,

      The plaintiff contractor ("Marx") hired the defendant subcontractor ("Dorrough") to frame a 140,000 square foot apartment building in Rensselaer, New York. Dorrough performed work on the project for several months until a dispute arose over payment, resulting in the souring of the parties' relationship and Marx hiring another subcontractor to complete the work. Both sides are now seeking to recover monetary damages against the other for breach of contract. Dorrough alternatively seeks to recover in quantum meruit and unjust enrichment for the value of additional services performed beyond the original scope of work.

1

In September 2023, the Court conducted a three-day non-jury trial. The Court heard testimony from three witnesses and received numerous exhibits into evidence. A summary of the credible trial evidence is set forth below.

## Summary of the Credible Trial Evidence

The parties' contract is dated August 31, 2017. Marx prepared the document using a standard subcontract agreement form (AIA Document A401-2007). The contract price was for $773,354 and included all the wood framing and sheathing work outlined in the scope of work (Contract, at §§ 8.1, 10.1). This scope of work expressly excluded items required for the project such as anchor bolts, a tie system, wood framing material, and certain strapping/bracing at shear walls (Contract, at § 8.1; Trial Transcript, at pp. 10-11, 25, 81-82). The contract further provided a procedure for Marx to make changes in the work and required Dorrough to submit a claim for additional costs or an extension of time (Contract, at Article 5; see also Contract, at §§ 9.6, 9.7). The general conditions of AIA Document A201-2007 ("General Conditions") also applied to the contract, except to the extent that a conflict existed (Contract, at § 1.2).

The contract specified that time was "of the essence" and attached a work schedule as an exhibit (Contract, at § 9.4 & Exhibit M). Based on the contract schedule, the framing work was expected to begin on July 25, 2017 (before the date of the contract) and continue for approximately 4.5 months (Contract, at § 9.4 & Exhibit M).[1] The starting date, however, was delayed for several months based on a problem with the foundation, which was caused by another subcontractor. Dorrough therefore could not commence work until November 13, 2017.

---

[1] Under the contract, the building framing was scheduled to occur from July 25, 2017 to October 17, 2017 (Area 1) and from August 10, 2017 to December 6, 2017 (Area 2) (Contract, Exhibit M).

Marx does not attribute any of the initial delay to Dorrough. Marx, however, expected that the durations in the contract work schedule would remain the same and that only the starting/ending dates would change. On November 29, 2017, Marx's project manager emailed a revised work schedule, explaining that the dates were "hard and fast" and that "we need to do everything we can to meet them" (Exhibit J-24).[2]

Dorrough, in contrast, did not share this same expectation. The parties' contract was never modified to include a revised schedule. The parties also conducted weekly meetings to discuss scheduling issues, and they further updated the anticipated deadlines throughout the project as circumstances changed. Marx, for example, required Dorrough to perform extra work during the project, including additional framing for 3,340 square feet, tie downs, strapping, and anchor bolts.[3] Dorrough also encountered several circumstances outside its control that delayed its performance. Among other things, the slab and foundation were not completed when Dorrough started framing; the foundation was larger than planned; the trusses had to be rebuilt; the steel was not timely installed; some of the steel had to be refabricated; the schedule failed to account for the winter weather; design changes were made; and Marx failed to make arrangements for someone else to complete necessary work that was expressly excluded from the parties' contract (i.e., tie downs, strapping, and anchor bolts).

By February 21, 2018, the parties disconnect on the timing of the work manifested itself. On that date, Marx issued a notice of intent to supplement Dorrough's work force pursuant to

---

[2] Under the revised schedule, the building framing was scheduled to occur from December 1, 2017 to May 11, 2018 (Area 1) and from December 6, 2017 to July 27, 2018 (Area 2).

[3] No dispute exists that the tie downs, strapping, and anchor bolts were out-of-scope work; that Marx directed Dorrough to perform it; that Dorrough performed the work; and that the additional 3,340 square feet of framing constituted extra work (Trial Transcript, at pp. 74, 77-78, 86, 109-111, 192, 331-332, 379-381, 418, 559-560).

3

Section 3.4.1 of the contract (Exhibit J-2; J-34). The notice asserted generally that Dorrough had failed to prosecute its work and that Marx would supplement the forces on February 23, 2018 if Dorrough did not "sufficiently progress … the wood framing installation."

Dorrough's owner testified that he was caught off guard by the February notice. This was the first time that Marx had informed Dorrough that it was behind schedule. Dorrough's owner believed that a disconnect existed between Marx's management and its field workers. In response to the notice, Dorrough's owner added additional workers to satisfy Marx and discussed the reasons for the delay. As a result, Marx elected not to supplement Dorrough's work force.

In May 2018, Marx again took issue with the progress of the work. By email dated May 18, 2018, Marx's project manager emailed its operations manager a list of alleged deficiencies, which included both in-scope and out-of-scope work (Exhibit J-47). Marx's project manager explained in his email that they have been asking Dorrough to complete some of these items for an extended period of time and other items were "simply things that need[ed] to be completed for [Dorrough's] scope to be complete" (Exhibit J-47).

By notice dated May 30, 2018, Marx issued another notice of intent to supplement Dorrough's work force due to Dorrough's alleged "failure to timely prosecute its work" (Exhibit J-3). The notice set forth the list of the specific items that Marx considered as incomplete, including the out-of-scope work that Dorrough had been performing (i.e., tie downs and strapping). In response to the list, Dorrough's owner emailed Marx's project manager, explaining that he was making his "best effort to finish all things [they] spoke about" and that "hopefully [they] both [would] fulfill [their] agreement to do all available work and to pay [him] for such work" (Exhibit J-50). Dorrough then diverted its attention to the items on Marx's list and again made sure that sufficient workers were available to perform available tasks. As a result, Marx again elected to

4

not supplement Dorrough's work force and further paid Dorrough for all the in-scope work it had performed during that pay period (Trial Transcript, at pp. 97, 468; Exhibit J-14).

In June 2018, Dorrough continued to perform additional work at the project. At the time, the parties were in a general agreement that the in-scope work was around 93% complete (Exhibit J-14). The outstanding work requested by Marx in its May 30 notice consisted of in-scope and out-of-scope work (Exhibit J-3). Dorrough was attempting to complete the remaining work. It was sending a crew of 17 people to the site daily.

As the next payment application period grew closer, Dorrough's owner attempted to initiate a discussion with Marx's project manager regarding the next payment application, as was their practice. The contract required payment every two weeks, and the last payment application covered the work performed for that period to June 1, 2018 (Trial Transcript, at pp. 97, 468; Exhibit J-14 [last payment application ("Period To: 06/01/18"); check memo]). In addition, Dorrough had not yet been paid for any of the extra work it had performed, including the extra framing (3,340 square feet), tie downs, strapping, and anchor bolts. Marx was also holding onto $35,830.13 in retainage (5%), which had been withheld from the progress payments made to Dorrough from the work completed (Contract, at § 11.7.1; Exhibit J-14).

Marx, however, was unwilling to have a meaningful conversation to discuss the amount owed to Dorrough for the unpaid work performed. Instead, Marx's project manager sent Dorrough's owner an email on the morning of June 12, 2018, seeking to charge Dorrough for $38,137.52 in materials; offering to pay it only $2,472 (and at a rate of $15 per hour) for the work performed since the last payment; estimating the time left to complete the remaining tasks; and asserting that Dorrough was so far behind schedule that Marx would need to supplement Dorrough's work force at no cost to Marx (Exhibit J-28).

5

[* 5]

Dorrough's owner typed his response in the text of the project manager's email (Exhibit J-46; compare with Exhibit J-28). He disputed the charges for the materials and explained that the remaining work included several items outside the scope of the work set forth in the contract. He further reasonably explained the reasons why the work remained incomplete and asserted that the parties still had to process the extra work changes for the tie downs ($35,000), sheer wall strapping ($27,500), and anchor bolts ($15,000). He further clarified that "we are finishing our scopes and have not vacated the job" (Exhibit J-46; Trial Transcript, at pp. 427-428). He also asked the project manager to "please supply material," explaining that Dorrough was not responsible for materials under the contract and that it was "taking this as a breach of contract" (Exhibit J-46).

In a subsequent email sent that same morning at 8:19 a.m., Dorrough's owner informed Marx that he was providing it with a "48 hour notice for failure to produce materials to complete [the] task at hand" (Exhibit J-49). In an email response sent shortly thereafter at 8:37 a.m., Marx's operation's manager told Dorrough's owner to "stop the bullshit" and disputed that Dorrough was missing any material. In the email, the operations manager further accused Dorrough's owner of telling the project manager that morning that he was "leaving the job and going to file a lien" (Exhibit J-49). The operations manager further informed Dorrough that Marx would finish the work and deduct the cost from the contract. In a follow up email sent two minutes later, Dorrough's owner provided a short response, asking the operations manager to "[p]lease refrain from profanity" (Exhibit J-49).

At trial, Dorrough's owner testified that he thought that he was still negotiating over the payment. He did not believe, however, that Marx "intended on honoring any deals that were made"

6

(Trial Testimony, at pp. 424, 427). Marx was being unreasonable.[4] Dorrough's owner further denied telling the project manager that he was leaving the job (Trial Transcript, at p. 579). He also testified that Marx's employee (through the project manager) told him in a phone call to get his equipment and trailer off the site (Trial Transcript, at pp. 580-581). The project manager and other employee did not testify and therefore did not refute this testimony.

The following day, on June 13, 2018, Dorrough removed his remaining equipment from the project and submitted three additional invoices, totaling $77,500, for the work performed for tie downs ($35,000), shear wall strapping ($27,500), and anchor bolts ($15,000) (Exhibit J-32). On that same day, Dorrough's attorney further sent a letter to Marx, stating that Dorrough "was instructed from your representative that it was not going to be paid the required Contract amount owed" and that Dorrough had been damaged in the amount of $211,900 as a result of the breach. The attorney further requested that Marx remit payment within 10 days (Exhibit J-17).

Thereafter, Marx did not change its position and the parties did not resolve their differences. Instead, on June 14, 2018, Marx began using one of the other framers (replacement subcontractor) at the project to complete the work. On June 25, 2018, Marx notified Dorrough that it had supplemented Dorrough's work force to complete the work (Exhibit J-29).

---

[4] Dorrough's owner explained, as follows:

> "But [when they offer] $2,400 when $130,000 is the number and they're not even willing to have a conversation with me about it, that kind of starts to become an impasse. You start to get the feeling that you're working for free or not going to get paid any further regardless, you know. Once I see that they're back-charging me for stuff that isn't my stuff and not paying me for stuff that clearly is [their responsibility] to pay to me, I definitely felt we were miles apart, but [I] was always willing [to have a] conversation" (Trial Transcript, at p. 447).

7

[* 7]

In December 2019, Marx commenced this action against Dorrough seeking damages for the cost to complete the work, damages for delays, and attorney's fees. Dorrough, in turn, asserted counterclaims against Marx seeking damages for breach of contract. Dorrough has since filed an amended counterclaim, including additional claims seeking these same damages based on quantum meruit and/or unjust enrichment.

## Analysis

## The Foundational Support for the Claims

Both sides have presented conflicting narratives of the facts. Marx, for example, asserts that Dorrough did not diligently prosecute the work; that Dorrough was not owed any money on June 12; that Marx had to expend more than $200,000 to complete the work; and that Dorrough abandoned the work. In contrast, Dorrough asserts that it diligently performed the work; that it performed a significant amount of unpaid work; that Marx no longer had any intention of honoring its deal; that the work was almost finished; and that it did not abandon the project.

Upon hearing the evidence presented, the Court now makes the following findings on these foundational issues:

### Dorrough Was Diligently Performing the Work

There is no merit to Marx's assertion that Dorrough was delaying or that it had the right to charge Dorrough for additional labor costs. "Where performance of a contract obligation is delayed by the request of the obligee that the obligor perform additional work, the obligee will not be permitted to assert to its advantage the failure of the obligor to perform within the time originally called for by the contract, and performance of the original and additional work will be required within a reasonable time thereafter" (Janowitz Bros. Venture v 25-30 120th Street Queens Corp., 75 AD2d 203, 210 [2d Dept 1980] [citations omitted]; see also Schenectady Steel Co. v.

8

Bruno Trimpoli Gen. Constr. Co., 34 NY2d 939, 940-941 [1974] [holding that "once the 'time of the essence' provision in the contract was waived ..., performance ... within a reasonable time was all that was required"]).

Further, "where one party demands strict performance as to time by another party, he must perform on his part all the conditions which are requisite in order to enable the other party to perform his part, and a failure on the part of the party demanding performance to do the preliminary work required in order to enable the other party to complete his within the time limited, operates as a waiver of the time provision in the contract" (Walter D. Watson & Co. v. Graves Elevator Co., 202 App Div 10, 13 [3d Dept 1922] [internal quotation marks and citation omitted]; see Walter Sign Corp. v State, 31 AD2d 729, 729-730 [4th Dept 1968]).

As discussed above, after the contract was made, Marx required Dorrough to frame an additional 3,340 square feet and to perform extra work, including but not limited to tie downs, strapping, and anchor bolts, all of which required Dorrough to perform an additional $100,000 worth of services. This significantly increased the time required to perform the in-scope work (a 13% increase in price), as demonstrated by the testimony of Dorrough's owner, and therefore resulted in an extension of time for Dorrough to perform its work.

Further, Marx continuously failed to have the site ready for Dorrough to perform the work. As Dorrough's owner credibly testified, the starting time in the contract was delayed by months; the slab and foundation were not ready when the framing began; the foundation and trusses were incorrect; the steel was not timely installed; design changes were made; and Marx failed to make arrangements for someone else to complete necessary work that had been expressly excluded from the parties' contract.

9

On June 12, 2018, for example, the strapping (out-of-scope work) still needed to be completed before the stairs could be installed; Marx still needed to supply materials for Dorrough to complete the work (e.g., windows, building wrap, studs, and plates); and Marx still needed to pump the water out of the elevator. The extra work for strapping certainly delayed the project, and the replacement framer was also unable to install the stairs in June. Rather, the replacement subcontractor performed at least two weeks of unidentified work (presumably strapping) before it started listing any entries for stairs (which still could have been for strapping) (Exhibit J-54). Marx further caused additional delay by attempting to require Dorrough to perform spray foam (out-of-scope work; 144 hours estimated to perform) without offering any adjustment to the price or time.

The Court further finds that Marx acted unreasonably by insisting that Dorrough perform the extra work without providing any adjustments for time. Section 5.2 of the contract limited Marx's right to add extra work without making a good faith adjustment for time (see Contract, at § 5.2 ["The Subcontractor may be ordered in writing by the Contractor ... to make changes in the Work ..., the Subcontract Sum and the Subcontract Time being adjusted accordingly" (emphasis added)]).[5] The General Conditions (applicable to the contract) further clarify that a major change

---

[5] Section § 5.2 of the contract provides in its entirety, as follows:

> "The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, including those required by Modifications to the Prime Contract issued subsequent to the execution of this Agreement, the Subcontract Sum and the Subcontract Time being adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall within twenty four (24) hours, submit to the Contractor written copies of a claim for adjustment to the Subcontract Sum and Subcontract Time for such revised Work in a manner consistent with requirements of the Subcontract Documents."

such as this required either a change order or a change directive, neither of which were issued in this case (General Conditions, Article 7) (Trial Transcript, at pp. 110-111). The General Conditions (Article 7) further clarify that the party making the change (Marx) is expected to propose an adjustment in the price and time or, if none, to at least clearly state that a change is being made and that no adjustment is being proposed. After the person making the change proposes an adjustment (or the lack thereof), the person required to perform the work may then disagree with the adjustment by submitting a claim to dispute the adjustment in time and/or having the architect resolve the adjustment in price.[6]

Further, the parties consistently disregarded the written procedure for changes/claims. As discussed above, Marx assigned extra work and caused various delays without adjusting the contract schedule or properly re-noticing the contractual deadline for completion. In addition, Marx did not object to Dorrough's performance until February 21, 2018, well after the originally scheduled completion date. Marx also indisputably directed extra work without issuing change orders or change directives (Trial Transcript, at pp. 74, 109-111, 192, 418). Even when Marx issued a change order, it did so after the work had already been performed (Exhibit J-38 [change order dated July 31, 2018]). Based on the circumstances, the Court finds that the parties waived their contractual right to insist upon strict compliance (see Janowitz Bros. Venture, 75 AD2d at 210; Walter D. Watson & Co., 202 App Div at 13; see also 107 S. Albany St., LLC v Scott, 211 AD3d 1380, 1381 [3d Dept 2022]).

---

[6] To the extent that Marx contends that Dorrough was required to first make a claim for a price/time adjustment based on the language of Section 5.2 of the contract, the Court disagrees. The claim provision in Article 5 of the parties' contract was never triggered in the first instance given that there was no change order, change directive, architect determination, or written proposal by Marx to make an adjustment to the contract time/price.

11

[* 11]

Marx also purports to claim ignorance by suggesting that it may not have known that the tie downs and strapping constituted extra work until June 12, 2018 (Trial Transcript, at pp. 179, 182). While the Court is not entirely persuaded that this was the case (see Trial Transcript, at pp. 380-381), it would not be equitable to invoke such grounds (mutual mistake) for the purpose of awarding Marx its expectancy damages. Marx also had the opportunity to retract its position after June 12 and has persistently refused to do so, as evidenced by its claims seeking hundreds of thousands of dollars in damages.

The June 12 Email

At the time of the June 12 email, Dorrough was owed approximately $22,000.00 for agreed-upon change orders; it had not yet been paid for the daily work that its crew had been performing in June 2018; it also had not been paid for performing the additional out-of-scope work, which it estimated was worth $77,500.00. Marx was also holding retainage in the amount of $35,830.13, which was 5% of Dorrough's earnings from the work that it had performed (Exhibit J-14).

On June 12, 2018, Marx therefore should have been discussing the value of the work performed and how/when it intended to pay Dorrough. As discussed below, this value equated to approximately $162,000.00. Notwithstanding, Marx was unwilling to have this conversation and instead displayed a clear intent to retain these funds for itself.

Indeed, rather than simply offering to pay approximately $22,000 for the agreed-upon change orders, Marx's project manager demanded, without any explanation, that Dorrough pay it $38,137.52 for materials, which were Marx's responsibility to purchase under the contract (Exhibit J-46). Marx later sought to increase this charge to $52,290.01 (an additional 30% for items such as overhead and profit) (Exhibit J-37). There was no basis for these charges, and Marx eventually

12

withdrew them in July 2018, after the parties' relationship had already been destroyed (Exhibit J-37; Trial Transcript, at pp. 107, 300, 534).

Marx was also no longer willing to provide Dorrough with any reasonable compensation for its work. Marx offered to pay Dorrough only $2,472 for its labor and further based this on an hourly rate of $15 per hour, which was less than the cost of the labor itself. Such a proposal was insulting and would have required Dorrough to work at a loss, as the wage/payment offered by Marx would not have covered Dorrough's labor expenses.

In addition, on June 12, this was the third time that Marx had wrongfully informed Dorrough that it planned to charge Dorrough for additional labor (Exhibit J-46). This itself threatened to completely deprive Dorrough of all the benefits of its bargain, as evidenced by Marx's absurd follow-up demand in this litigation that Dorrough (which performed the work) should have to pay Marx the sum of $378,020.51.

These actions were also completely unnecessary for Marx to protect itself. On June 12, there were more than sufficient funds on the contract (approximately $56,000.00) to complete the remaining work (discussed below). Even based on the estimates of Marx's project manager, the cost to complete the in-scope work should have cost between $20,000 to $30,000. The bulk of the work (93%) had also already been inspected and was found to be satisfactory. According to Marx's operations manager, "[t]here were a couple of issues, but nothing substantial" (Trial Transcript, at p. 37).[7]

---

[7] One of the issues involved the sliding patio doors. This defect, however, appears to have been relatively minor and accounted for in the project manager's June 2018 estimates (Exhibit J-46; J-51).

<u>The Work Was Almost Complete</u>

The incomplete work is listed in the June 12 email and June 25 letter. The out-of-scope work indisputably consisted of the "Fire Wall Strapping," "Tie Downs in A & C," and "Finish Shear Wall Strapping/Plywood A, B, & C," which were items expressly excluded from the scope of work. The "Spray Foam at Windows/Sliders" was also out-of-scope work, as Dorrough's owner credibly testified that spray foam concerns insulation (rather than installation) and that his workers were not qualified to perform the work (Trial Transcript, at pp. 408, 431). In total, Marx's project manager estimated that it would take 322 hours to complete these four tasks.

The Court disagrees with Marx's assertion that all this work was incorporated into the parties' contract and therefore required Dorrough to complete all of it. The parties did not have any oral agreement, or course of performance, regarding the spray foam (144 hours estimated to complete). In addition, the parties' oral agreement and course of performance regarding the strapping and tie downs was limited to only the services performed. As Dorrough's owner testified, without contradiction: "I was told that I would get paid to do it <u>until</u> somebody else was found" (Trial Transcript, at p. 380 [emphasis added]).

Turning to the in-scope work, several of the items listed in the June 25 letter as incomplete did not require any substantial time to complete, as Marx's project manager concluded in the June 12 email. This includes the time required to complete the window installation (4 hours left), the building wrap (apparently 3 hours left per area for four areas), and the window flashings (1 hour left) (Exhibit J-29; J-46). As reflected below in Table 1, the remaining major (in-scope) work consisted of only 8 items (including clean up) and required only 578 hours to complete according to Marx's project manager. Based on the project manager's email and the evidence in the record

14

regarding reasonable rates, the cost to complete this work was somewhere between $20,808.00 ($36/hour) and $31,790.00 ($55/hour), depending on the cost of the labor.

Table 1

| Remaining In-Scope Work (Excluding Minor Items) | Marx's PM – Estimate in June 12 Email | Cost at $36 per hour | Cost at $55 per hour |
|---|---|---|---|
| Kitchen island/Peninsula walls in A and C | 32 hours left | $1,152 | $1,760 |
| In wall blocking in A & C Wing Apartments | 32 hours left | $1,152 | $1,760 |
| Framing of interior walls Apartments 201, 301, 401 | 24 hours left | $864 | $1,320 |
| Stair Towers (3 in total) | 120 hours left per stair tower, total of 360 hours | $12,960 | $19,800 |
| General Building Cleanup | 50 hours left | $1,800 | $2,750 |
| Elevator Blocking | 40 hours left | $1,440 | $2,200 |
| Sliding Door Hardware Install | 20 hours left | $720 | $1,100 |
| Sliding Door Rehanding | 20 hours left | $720 | $1,100 |
| **Totals** | **578 hours left** | **$20,808** | **$31,790** |

Dorrough's owner conceded that the time estimates for these items were not unreasonable (Trial Transcript, at pp. 436-437). He also believed that the cost to complete the work should have been less than $30,000 (somewhere in the $20,000 range) (Trial Transcript, at pp. 543-544, 589). He testified that he had completed approximately 98% of the work (as of June 12) (which equates to $15,467.08 of the in-scope work left) and that he "could have [completed the remaining in-scope work] in under a week, … maybe a week and a half with a smaller crew" (Trial Transcript, at p. 449).

In contrast, Marx asserts that it cost substantially more to complete the work and that it took months to perform. Marx further asserts that it paid the replacement subcontractor the sum of $243,064.00. As demonstrated at trial, however, a significant portion of these payments concerned out-of-scope work, including the construction of a garage and the completion of the remaining tie down and strapping work. The cost to complete this work is not recoverable and cannot be awarded as part of any direct/expectation damages. Some of the charges also include the cost to correct allegedly defective work. Marx, however, failed to particularize the allegedly

15

defective work or explain how Dorrough caused the alleged defects. The trial record also does not contain any photographs of the alleged defects, inspection reports, or any expert analysis to conclude that any of the work was defective.

The documentary proof submitted by Marx was also not credible. There are numerous time entries that omit any description of the services performed. Other entries contain very generalized descriptions and are difficult to read. Marx also did not offer into evidence any written agreements that it had with the replacement subcontractor or other documents defining its scope of work. Marx also did not call the replacement subcontractor as a witness to explain the work performed and the scope completed.[8]

Marx has also failed to adequately explain the large disparity between its June 12, 2018 estimate and the alleged actual time it took to complete the work. Marx's claim is even more suspect given that Marx added a 30% mark up (including profit for itself) to the costs of the replacement subcontractor (Trial Transcript, at p. 165). This mark-up scheme provided motive for Marx to inflate and fake its alleged costs.

Overall, the Court rejects Marx's proof on this issue as largely deficient and misleading. Having considered the credible evidence presented, the Court finds that the cost to complete the work was only $30,000.00 (rather than $243,064.00).

---

[8] While the Court does not afford any weight to the replacement subcontractor's prior statements made in an affidavit filed in this case (as Marx did not have an opportunity to cross examine him), the Court notes that the replacement subcontractor explained that he completed the in-scope work in approximately 800 hours and that he charged $36 per hour for his workers' time and $40 per hour for his time. This would equate to a cost of approximately $30,000.

16

## Marx' Claims

Turning to the underlying claims, Marx alleges that Dorrough breached the contract by abandoning the project, causing damages to a boom lift, performing defective work, and delaying. Marx alleges that it sustained $108,281.00 in direct damages and $164,794.84 in delay damages.

The Court disagrees that Dorrough abandoned the project. On this issue, Marx relies heavily on a hearsay statement in an email from Marx's operations manager accusing Dorrough's owner of informing the project manager (who did not testify) that he was leaving the job. Dorrough's owner, however, denied making this statement. The emails further corroborate this testimony from Dorrough's owner, as he had assured the project manager that same morning that they were finishing their scopes and had not vacated the job (Exhibit J-46). That same morning, Dorrough's owner had also asked Marx's project manager to provide the materials necessary to compete the work and sent a follow up email to Marx, providing it with a 48-hour notice.[9]

Nonetheless, even if Dorrough had desired to end the parties' working relationship, the Court would find that Marx shared this same intention at the time. Both the project manager and the operations manager seemed very eager on June 12 to replace Dorrough. Marx's employee further told Dorrough's owner that day to remove his equipment and trailer from the work site. Marx then immediately replaced Dorrough two days later, without even attempting to engage in any further discussions on the matter. Marx further made zero effort after June 12 to correct its mistakes or admit that it had misinterpreted the contract. In fact, at no point after the June 12 email did Marx provide any assurances to Dorrough that it intended to honor its contractual obligations.

---

[9] The Court further disagrees that Dorrough repudiated the contract on June 13, when its attorney sent a demand letter to Marx. The June 13 letter was an appropriate response to the June 12 email. In addition, to the extent that any alleged confusion may have existed over the letter's meaning/intent, Marx could have easily reached out to Dorrough or its counsel to discuss the matter.

17

The Court therefore finds that even if Dorrough had no intention of returning to the work site, Marx similarly shared the mutual desire to end the parties' working relationship and, as such, Marx cannot claim that Dorrough breached the contract or caused it any damages by walking off the job or sending the June 13 letter.

In any event, prior to Dorrough allegedly abandoning the project, Marx had already breached and repudiated the contract. As discussed above, Marx wrongfully issued notices threatening to supplement Dorrough's work force; wrongfully accused Dorrough of delaying; wrongfully directed Dorrough to perform extra work without issuing a change order or change directive; refused to engage in good faith discussions to adjust the contract price and time; wrongfully charged Dorrough for $38,137.52 in materials; and refused to engage in good faith negotiations to resolve the parties' payment dispute.

The June 12 email from Marx's project manager further constituted an anticipatory repudiation of the contract. An anticipatory repudiation is "an unqualified and clear refusal to perform" and "may be found if a repudiating party is seeking to avoid its obligations by advancing an 'untenable' interpretation of the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions" (O'Connor v Sleasman, 37 AD3d 954, 956 [3d Dept 2007] [internal quotation marks and citation omitted]). As explained above, in the June 12 email, Marx's project manager advanced several untenable interpretations of the contract, including the belief that Dorrough owed it for materials; that Dorrough had been delaying; and that Marx had the right to charge Dorrough for the materials and supplemental labor. The email further displays a clear and unequivocal intent by Marx to usurp the remaining balance on the contract for itself and to deprive Dorrough of the benefit of its bargain.

18

Based on the circumstances, the Court finds that Marx's breach and repudiation excused Dorrough from having to perform its obligation to complete the work (see U.W. Marx, Inc. v Koko Contr., Inc., 124 AD3d 1121, 1122 [3d Dept 2015]; Restatement [Second] of Contracts §§ 237; 241-242; see also Smith v Wetmore, 167 NY 234, 239 [1901]; Adirondack Classic Design, Inc. v Farrell, 182 AD3d 809, 815 [3d Dept 2020]; Farrell Heating, Plumbing, Air Conditioning Contractors, Inc. v Facilities Development & Improv. Corp., 68 AD2d 958, 959 [3d Dept 1979]; Alpine Courts, Inc. v Wiedermann, 34 AD2d 951, 953 [2d Dept 1970]).

The Court further disagrees that Dorrough was required to comply with the notice provision in the General Business Law prior to suspending its performance for nonpayment (see GBL §§ 756; 756-a; 756-b). The provisions relied on by Marx do not apply to cases such as this one, which involves disputed invoices, extra work, back charges, and an anticipatory breach. Nor does the parties' contract require any such notice as a conditional precedent to suspending performance.

In addition, even assuming for the sake of argument that Dorrough's conduct on June 12 and/or June 13 amounted to a breach/repudiation, the Court would not award any damages to Marx for the cost to complete the work. As explained above, the cost to complete the work was only $30,000.00 (rather than $243,064.00, as alleged by Marx). Marx used the remaining balance on the contract ($56,751.36) to pay this amount ($30,000.00) and therefore has not sustained any damages because of the alleged abandonment.

Marx also failed to establish its right to charge an additional 30% of the cost to complete the work for its general conditions, overhead, and profit, pursuant to Section 3.4.1 of the contract. As explained above, Marx breached and repudiated the contract, which relieved Dorrough from

19

its obligation to perform the remaining work under the contract; Marx therefore had no right to charge for these items under this provision in the contract.[10]

Regarding the remaining breaches/damages alleged by Marx, the Court finds that Marx failed to credibly establish that Dorrough caused any delay (discussed above), damaged its boom lift, or performed inadequate/defective work regarding the closets/parapet. On these issues, Marx offered limited documentary support and presented testimony from only two witnesses (i.e., its owner and its operations manager). While these witnesses were credible for the most part, they lacked personal knowledge of the specific events that transpired at the project on a daily/weekly basis. In addition, Dorrough's proof was more credible and persuasive on these issues.

Further, although Marx alleges that it incurred $40,071 in direct labor costs, it has similarly failed to present any credible evidence to attribute such costs to any defects in Dorrough's work (Marx's Post-Trial MOL, at page 36). Moreover, even if any actionable delay had occurred, Marx failed to prove its alleged delay damages ($164,794.84) with any reasonable degree of certainty. The proof offered on this issue was speculative and insufficient to justify any award for delay damages (see City of New York v State, 27 AD3d 1 [1st Dept 2005]; Rusciano Constr. Corp. v State, 37 AD2d 745 [3d Dept 1971]).

### Dorrough's Counterclaims

In light of the above analysis, the Court finds that Dorrough may recover the following damages: the remaining balance available on the contract, minus the cost to complete the work;

---

[10] In addition, the plain language of this provision appears to authorize a mark-up only for work performed by Marx. By its plain terms, this provision does not appear to authorize a mark-up for the amounts paid to another subcontractor to perform the work (see Contract, at § 3.4.1 ["Any work performed by the Contractor shall be subject to cost of the work plus general conditions of ten percent (10%), overhead of ten percent (10%) and profit of ten percent (10%)" (emphasis added)]).

20

the value of the agreed-upon change orders; the retainage; and the value of the tie downs, strapping, and anchor bolts.

Besides the last three items for extra work, the amounts due to Dorrough are readily ascertainable from the above-referenced findings. The remaining balance on the original contract ($56,751.36) minus the cost to complete ($30,000.00) equals $26,751.36. Marx indisputably approved change orders (albeit in July 2018) for the additional framing (as well as for DensGlass and a dummy wall) in the amount of $22,321 (Exhibit J-38; see also J-46 [purporting to agree to change orders for this extra work in the amount of $22,332]). In addition, the value of the retainage is $35,830.13, as reflected in the final payment application approved by Marx (Exhibit J-14).

The Court further finds that the value of the tie downs, strapping, and anchor bolts is $77,500 based on the invoices issued on June 13, 2018 (Exhibit J-32) and the testimony of Dorrough that such amounts were fair and reasonable (Trial Transcript, at pp. 450-451) (see Paul F. Vitale, Inc. v Parker's Grille, Inc., 23 AD3d 1147 [4th Dept 2005]; see also Johnson v Robertson, 131 AD3d 670 [2d Dept 2015]). The Court further relies upon Dorrough's testimony that he had previously agreed with the project manager to perform extra work at a rate and $55 per hour (as reflected in one of the prior invoices), and that he relied upon this rate and the hours necessary to achieve the percentage of work completed (Trial Transcript, at p. 383-384, 425; Exhibit J-38). Regarding the strapping and the tie downs, the Court further relies on that portion of the email from the project manager opining on the percentage of work completed on these tasks (as of June 12) (Exhibit J-46) and the testimony from Marx's owner regarding the estimated time required to perform the work (Trial Transcript, at pp. 249-260).

Moreover, as explained above, the provisions in the contract requiring compliance with specific procedures to authorize extra work do not preclude Dorrough from recovering for the

21

value of this work (see 107 S. Albany St., LLC v Scott, 211 AD3d 1380 [3d Dept 2022]; Saeteros v Seven Up Realty, LLC, 187 AD3d 559, 559 [1st Dept 2020]; Tridee Assocs. v New York City School Constr. Auth., 292 AD2d 444, 445 [2d Dept 2002]).[11]

In addition, the Court further awards Dorrough pre-judgment interest on the amount due at a rate of 9% per year from June 12, 2018 (the date of the breach/repudiation) (see CPLR 5001; 5004). Accordingly, the Court awards Dorrough the following amounts:

Table 2

| Description | Value |
| --- | --- |
| Contract Balance (minus cost to complete) | $26,751.36 |
| Tie Downs (as of June 12) | $35,000.00 |
| Strapping (as of June 12) | $27,500.00 |
| Anchor Bolts (as of June 12) | $15,000.00 |
| Agreed-Upon Change Orders | $22,321.00 |
| Retainage | $35,830.13 |
| **Total Damages (without interest):** | **$162,402.49** |
| Interest at 9% per year | $84,653.97 (as of 3/26/24) |
| **Total Amount (with interest)** | **$247,056.46** |

The Court, however, declines to award Dorrough that portion of the remaining contract balance used by Marx to complete the work ($30,000). The plain language of the parties' contract

---

[11]    As explained above, the evidence establishes that Marx directed the extra work and that Dorrough performed it. In fact, Marx's operations manager testified, as follows:

> "Q And when you asked him to do that work, did you submit a change order to him? A No. Q Did you submit a contractor's directive for him to do that work? A No. Q Was there anything signed for him to do the work? A No. Q Did you expect him to do the work? A Yes. Q Would you say that would be a modification from that subcontract? A Yes. Q Kind of the custom and procedure between the contractor and a subcontractor? A Yes. Q Would it be fair to say that you would have expected that Mr. Dorrough would get paid for the extra work he did? A Yes. Q Even though it might be some technical deviation from that written contract? A Yes."
> (Trial Transcript, at p. 110-111).

22

[* 22]

clearly evidences the parties' intent that Dorrough would not be paid for any work that was not completed. Article 12 of the contract, for example, required all the work to be completed prior to final payment (Contract, at § 12.1). Article 7 of the contract further precluded Dorrough for recovering for unperformed work in the event of a termination by Marx (even if wrongful) (see Contract, at §§ 7.2.1 & 7.2.3 [precluding recovery for "lost profit or overhead for that portion of the work not performed"]; see also Contract, at § 7.2.4 [limiting damages in the event of a wrongful termination]). In addition, even if the contract did not expressly preclude these damages, Dorrough failed to submit any evidence of the costs it saved by not having to complete the work.

Alternative Measure of Damages If Dorrough Had Breached

Further, even if Dorrough had breached, these damages would still be the same based on the plain language of the contract, the doctrine of substantial performance, and/or based on quantum meruit (extra work). The plain language of the contract requires that Dorrough would be paid the remaining balance on the contract (if excess funds existed), even in the event of a breach by Dorrough. The provision relied upon by Marx to supplement the work force (Section 3.4.1), for example, permitted Marx to deduct the cost to complete the remaining work; it did not allow Marx to usurp for itself the excess balance on the contract (Contract, at § 3.4.1 ["the Contractor may ... provide any such labor, equipment, and materials and deduct the cost thereof, from any money then due or thereafter to become due to the Subcontractor"]). Similarly, even in a case where cause existed to terminate Dorrough, the contract still obligated Marx to pay Dorrough for its services if excess funds existed (Contract, at § 7.2.1 ["If the unpaid balance of the Subcontract Sum exceeds the expense of finishing the Subcontractor's Work and other damages incurred by the Contractor, such excess shall be paid to the Subcontractor"]).

23

The Court disagrees that Marx had the right to withhold these funds based on the amount in dispute; Dorrough's alleged failure to complete the paperwork for the excess; and the filing of the mechanic's lien. The record demonstrates that Marx grossly exaggerated its damages in this case, and therefore had no basis to withhold the funds based on this ground. The record also demonstrates that the submission of a final payment application (or any other required paperwork) would have been futile (and therefore unnecessary) given Marx's erroneous and unreasonable position that it did not owe any excess funds. In addition, Dorrough had the right to file a notice of mechanic's lien based on Marx's refusal to pay it for the work performed (Lien Law § 34) and, in any event, the mechanic's lien was bonded in July 2018, which discharged the lien.

Similarly, under the doctrine of substantial performance, Dorrough would be entitled to the remaining amount due under the contract less the cost to complete the work (see Merritt Meridian Constr. Corp. v. Old Country Iron Works, 229 AD2d 661, 663 [3d Dept 1996]; F. Garofalo Elec. Co. v N.Y. Univ., 300 AD2d 186, 189 [1st Dept 2002]). While "[t]here is no simple test for determining whether substantial performance has been rendered, ... several factors must be considered, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance" (Hadden v Consolidated Edison Co. of N.Y., 34 NY2d 88, 96 [1974]).

As explained above, the remaining work cost only $30,000.00 to complete. This equates to only 3.9% of the in-scope work. In addition, when adding the value of the extra work performed (approximately $100,000), this number is further reduced to only 3.4%. Based on these numbers,

24

the Court finds that Dorrough performed more than 96% of the in-scope work and nearly 97% of the value of the work that it was required to perform.

As explained above, Dorrough did not complete the work as a result of the June 12 email, in which Marx made unreasonable demands and misinterpreted the parties' contract. The Court does not consider the omission as intentional in light of these circumstances. In addition, the photographs in the record demonstrate that the purpose of the contract (framing) was substantially completed, with minor work remaining (the majority of which involved the installation of three pre-fabricated staircases). Dorrough has also not been paid for a very substantial amount of the work that it performed. Under these circumstances, if it were necessary to reach the issue, the Court would find that Dorrough substantially performed (see Merritt Meridian Constr. Corp. v. Old Country Iron Works, 229 AD2d 661, 663 [3d Dept 1996]; Norberto & Sons, Inc. v County of Nassau, 16 AD3d 642 [2d Dept 2005]; Michael G. Buck & Son Constr. Corp. v Poncell Constr. Co., 217 AD2d 925,926 [4th Dept 1995]).

Further, even if Dorrough had breached, the Court would still award the value of the extra work in quantum meruit. As discussed above, Marx does not dispute that the work was performed or that Dorrough should get paid for this work. In addition, assuming for the sake of argument that Dorrough had breached, the Court disagrees that Dorrough would not have a right to payment or pre-judgment interest based on its failure to submit a final payment application. As discussed above, Marx took an unreasonable position and was unwilling to pay Dorrough any reasonable amount. As such, Dorrough's submission of a final payment application would have been excused as futile. In addition, Marx should have completed the work and processed the final payment application by September 12, 2018. Marx's failures to timely complete the work, negotiate the dispute in good faith, and process the final payment application by such time would justify an

25

alternative award of interest at 9% from September 12, 2018 (if Dorrough had breached the contract, which it did not).

## The Parties' Request for Attorney's Fees

The parties also request attorney's fees. The applicable provision in the contract provides, as follows:

> "In the event of a breach of this agreement by the Subcontractor, the Subcontractor is liable to the Contractor for its reasonable attorney's fees and costs incurred as a result of the Subcontractor's breach. The Subcontractor expressly understands that under no circumstance is it entitled to the collection of attorney's fees and costs from the Contractor."

As discussed above, Marx has failed to demonstrate that Dorrough breached the contract. Marx is therefore not entitled to any attorney's fees. In addition, even if a breach occurred, Marx is not the prevailing party (as it has not been awarded any damages) and therefore is not entitled to an award for any of its attorney's fees.

Regarding Dorrough's request for attorney's fees, the Court finds that the contract was designed to preclude Dorrough in all circumstances from recovering any attorney's fees in litigation, even if it were the prevailing party. The Court questions the validity of this provision given the lack of mutuality and the severe disparity in the parties' bargaining positions, as evidenced by the one-sided contract prepared by Marx. Such a provision in construction contract cases dissuades subcontractors from filing legitimate claims and provides owners/contractors with disproportionate bargaining leverage over disputes.

If Marx had established a basis to recover its attorney's fees under this provision, the Court would have struck this provision in its entirety based on public policy grounds. As Dorrough is the prevailing party, the Court has considered reforming the provision to make it mutual. The

26

Court, however, declines to rewrite the parties' agreement on public policy grounds based on the significant amount of interest awarded to Dorrough in this case.

The Court has considered the parties' remaining contentions and finds them to be either rendered moot based on this decision or otherwise lacking in merit.

It is therefore,

**ORDERED, ADJUDGED, and DECREED** that the first, second, and third causes of action in the complaint are **DISMISSED**; and it is further

**ORDERED**, that the motion by the Plaintiff to conform the pleadings to the proof to increase the amount demanded in the ad damnum clause is denied as moot; and it is further

**ORDERED, ADJUDGED, and DECREED** that the Defendant, Dorrough Construction Inc. does hereby recover judgment against the Plaintiff, U.W. Marx, Inc., on its first amended counterclaim for breach of contract in the amount of $162,402.49 for damages, plus interest at 9% from June 12, 2018, for a total amount of **$247,056.46**, together with costs and disbursements; and that the Defendant shall have execution therefor.

This shall constitute the Decision, Judgment, & Order After Trial of the Court. The Court is hereby uploading the original decision into the NYSCEF system for filing and entry by the County Clerk. The Court further directs the parties to serve notice of entry in accordance with the Local Protocols for Electronic Filing for Saratoga County.

Dated: March 26, 2024
at Ballston Spa, New York

HON. RICHARD A. KUPFERMAN
Justice Supreme Court

27